### In re Ronald Richard EISENBARTH, and Ramona Virginia Eisenbarth, Debtors.

#### Bankruptcy No. 85–05147.

United States Bankruptcy Court, D. North Dakota.

June 23, 1987.

James Coles, Bismarck, N.D., for debtors.

Sean Smith, Bismarck, N.D., for Fed. Land Bank.

Malcolm Brown, Mandan, N.D., for Production Credit Ass'n.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Second Amended Plan Of Reorganization filed by Ronald and Ramona Eisenbarth (Debtors) on March 6, 1987. The Debtors filed a Chapter 11 petition on March 15, 1985. A motion for confirmation pursuant to section 1129(b)(1) of the Code was filed by the Debtors on February 17, 1987. Production Credit Association (PCA), Federal Land Bank (FLB) and the United States Trustee have all filed objections to the plan currently under consideration. A confirmation hearing was held before the undersigned on May 4, 1987. The court finds the material facts to be as follows:

### Findings of Fact

The Debtors are farmers in southwestern North Dakota. Ronald Eisenbarth has been farming since 1953. The Debtors' farm consists of approximately 1,310 owned acres most of which is crop land with the balance being pasture land. From 1961 to 1974 the Debtors raised sheep on their farm and also farmed considerable crop land. Since 1974, the Debtors have not had livestock on their farm. The Debtors, in an effort to diversify, have projected adding hogs and sheep to their operation. However, the Debtors have now decided to refrain from the hog business, and intend to become exclusively involved in sheep production. The Debtors have not bought any land since buying their current farm from Ronald's father in 1967. However, interest on loans for construction of a barn, quonset, and house in the early to mid 70's appear to have caused a portion of the Debtors' financial problems. Adverse weather conditions in 1981 through 1984, along with low crop prices have also impeded the Debtors' attempt to make their operation profitable.

#### 1. Valuation of Real Estate

A major dispute between FLB and the Debtors is the value of the 1,310 acres of land on which FLB has a first mortgage. The Debtors relied upon the appraisal of Robert Penfield, an auctioneer, real estate agent, and appraiser. Penfield testified that the Debtors' land consisted of 862 tillable acres, 253 grass acres, and 200 waste acres.

Penfield used principally a comparable sales approach in valuing the Debtors' property, and determined that the fair market value of the property was $147,840.00. Penfield also testified to a capitalization rate value on the property, using a crop cash rent per acre of $15.00 and $6.00 per acre for pasture, for total rental income of $14,448.00. He then multiplied this figure by eight, to arrive at a capitalization value of $115,504.00. Penfield did not have any reason for using the eight multiplication factor other than that it is what investors use. He testified that he would have to look to his books to determine a capitalization rate. Penfield only used three comparables in the comparable sales approach to value, which he did not confirm. He did not allow any contributory value for the buildings either, as he testified that there is very little contributory value on buildings in southwestern North Dakota. Penfield testified that the subject property was not more than 20% class two and three soil, a fair amount of class four, and a good amount of class six and seven.

Bill Knutson, an independent fee appraiser, appraised the property for FLB. Knutson testified that 75% of the subject property is class two and three soils. This statement is supported by soils maps introduced into evidence. Class two and three soil is suited for cultivation and other uses; a low class number indicates better soil. Knutson believed that the buildings added value to the subject property, and were worth approximately 30% of their original cost. Knutson's first appraisal was done December 2, 1985. At that time he determined the value of the property to be $280,000.00, based on comparable sales, which included a $40,000.00 contributory value for the buildings. Knutson has since reduced his initial appraisal by 17% to adjust for decline in value on real estate since December of 1985. Knutson also updated his appraisal with eight more recent comparables. Based upon the comparable sales, or market data approach, Knutson believes the property to have a present value of $232,400.00. After adjusting for the $33,200.00 depreciated value of the improvements, the bare real estate has a value of $199,200.00, or approximately $150.00 per acre. Knutson also checked his market data appraisal by using an income approach to value. This procedure converts anticipated income to be derived from the ownership of the property into a value estimate. Anticipated future income is discounted to a present worth figure through a capitalization process. Knutson estimated a gross income of $20,810.00, with net income of $16,030.00 after deducting for taxes, insurance, management, repairs, and replacements. He used a capitalization rate of 7.5% (16,030 ÷ .075) and arrived at a value of $213,733.00.

Ronald Eisenbarth and Lloyd Stewart, an area rancher with considerable finance and soil conservation experience, testified that the subject property has a significant alkali problem, with alkali increasing over the property at the rate of 20 to 40 acres per year. Knutson, however, factored the alkali problems into his analysis, and appears to have been aware of the condition.

The court is persuaded by Knutson's appraised value of the property. His appraisal is much more thorough and complete than Penfield's. Penfield's determination that 20% of the soils are class two or three is clearly in error. Moreover, Penfield effectively used a capitalization rate of 12.5%, far higher than this court has ever heard used or testified to by other appraisers. Knutson's capitalization rate of 7.5% is in the ball park of what is normally used, and what this court considers to be a valid capitalization rate. Although the ag economy and real estate values are depressed, the contributory value of a quonset, house, and pole barn, each approximately 15 years old, cannot be totally ignored. The court believes a contributory value of $33,200.00, which includes the December, 1985 value of $40,000.00, less a 17% decline, is appropriate.

The Debtors argue that the property should be valued based upon the Debtors' ability to pay for the property out of the proceeds of that property under the management of the Debtors. The court does not agree. Historically, real estate has seldom ever been capable of being paid

for based solely upon its ability to produce. A capitalization rate of 7.5% on agricultural real estate, as the capitalization rate is on the Debtors' property, indicates that an investor buying the land with cash, after deducting for real estate taxes, management fees and other expenses, would obtain a 7.5% annual return on its investment. However, if this property is 100% financed, the investor would likely be paying 11% to 12.5% interest per year, plus principal, on the money borrowed to purchase the property. Thus, the investor would not be obtaining a return from the real property sufficient to make its annual payments on the money borrowed to purchase the property. These payments would have to be supplemented from outside income. This example shows that the sole determination of land value is not the ability of the land alone to produce sufficient income to make the land payments. Pride of ownership, hedge against inflation, security of having property to farm, and various tax deductions all are factors which go into the market value of agricultural real estate. Simply put, land is worth what the market will bear. Supply and demand determines the value of real property. Based upon Knutson's comparable sales analysis, and his appraised fair market value of the Debtors' real property mortgaged to Federal Land Bank, the court determines the fair market value of the property to be $232,400.00.

## 2. *Plan Treatment*

The Debtors project administrative expenses of $2,500.00 to be paid upon confirmation of the plan, and the plan also provides for payments to Grant County for real estate taxes in arrearages. Payments of $542.95 will be made for four years to pay the delinquent real estate taxes.

The Debtors' plan proposes to pay FLB $12,901.00 per year, based on a class 5 secured claim of $126,720.00 amortized over twenty-five years at 9% interest. The Debtors arrive at this figure by deducting from what they believe to be the fair market value of the property of $137,220.00, the Debtors' stock in FLB in the amount of $10,500.00. After deducting $137,220.00 from Federal Land Bank's stated claim of

$234,696.00, the Debtors arrive at an unsecured claim of $97,476.00. The unsecured portion of the claim is treated as a class 7 unsecured claim to be paid over ten years at the total rate of ten cents on the dollar, or 1% per year. The $234,696.00 claim was of March 15, 1985. FLB believes that its total claim is presently $303,489.44. This amount includes principal, plus accruing interest to date. The current unaccelerated variable interest rate on the Debtors' loan from FLB is 12.5%.

The Debtors' plan proposes to pay PCA $6,837.04 per year on a class 6 secured claim of $43,875.00. This amount is amortized at 9% interest over ten years. The value of PCA's collateral, i.e. equipment, is $29,070.00. The plan proposes to treat $23,008.00 of PCA's claim as a Class 8 unsecured debt, payable over ten years at ten cents on the dollar, or 1% per year. PCA believes that its total claim is presently $105,379.00, including accruing interest to date. PCA's current variable interest rate is 12.56%.

The plan proposes to pay the following class 9 unsecured consequential creditors, whose allowed claims are more than $250.00, 100% of the total claim, amortized over five years at 0% interest. These claims include:

| | |
|---|---|
| R & S Sales | $ 967.20 |
| Erickson Oil | $1,364.98 |
| Jim's Plumbing & Excavating | $1,442.71 |
| Total | $3,774.89 |

All class 9 claim holders have voted to accept the plan.

The class 10 inconsequential unsecured claim holders, those holding claims of $250.00 or less, are proposed to be paid in full on the date of distribution, as follows:

Edward Grunett, CPA, $211.25

Grunett has voted to accept the plan.

## 3. *Feasibility Data*

The Debtors have submitted financial data consisting of previous actual cash flow information, as well as projected cash

flow information during the initial three to four years of the plan. The information, however, is somewhat dated. The Debtors' cash flow projection was prepared August 21, 1986, and includes the following material information:

| | Actual Dollar Amounts | | | | Projected Dollar Amounts | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| INCOME | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
| Sheep | | 9,600 | | . | 3,000 | 5,000 | 10,000 | 10,000 |
| Swine | | | | | 17,220 | 17,220 | 17,220 | 17,220 |
| Gross Income | 82,277 | 85,715 | 42,776 | 71,595 | 107,154 | 108,970 | 114,020 | 114,070 |
| EXPENSES | | | | | | | | |
| Interest | 32,849 | 25,336 | 32,387 | | | | | |
| Feed Purchased | 387 | 231 | 223 | 407 | 11,826 | 11,826 | 11,826 | 11,826 |
| Total Expenses | 82,729 | 84,968 | 113,633 | 48,072 | 58,426 | 60,761 | 63,681 | 63,681 |
| Net Farm Income | −452 | 747 | −70,857 | 23,523 | 48,728 | 48,209 | 50,339 | 50,389 |
| Family Living Expenses | | | | | 18,000 | 18,750 | 19,500 | 19,500 |
| Machinery Replacement Expenses | | | | | | 5,000 | 5,000 | 5,000 |
| Available for Debt Service | | | | | 30,728 | 24,459 | 25,839 | 25,839 |

The Debtors' cash flow for 1986 projected $30,728.00 of income available at year end for plan payments. The 1986 cash flow projection was not met, in part because the Debtors did not raise hogs, as projected, because the profit margin was no longer there. Instead, the Debtors have obtained sheep and are building a sheep operation. The Debtors do not have any substantial cash on hand. However, this alone, does not indicate that the Debtors have not been making any forward momentum during the course of these bankruptcy proceedings. Expenses of purchasing sheep, ongoing livestock expenses, and crop production expenses may well have been paid out of the 1986 income. However, from the evidence produced at the hearing, the court is unable to discern whether or not income has been generated and used for these purposes. The Debtors project $10,000.00 income in 1987 from their sheep operation, as compared to their initial projections in the cash flow of $5,000.00. This increase is due to the Debtors' intentions to expand the sheep operation, and eliminate the hog operation. The Debtors have considerable previous experience in raising sheep. While the Debtors' sheep income projection increases $5,000.00 for 1987, the Debtors' hog income projection of $17,220.00 will be eliminated. Ronald Eisenbarth testified that the expenses are less with sheep than with hogs, although no testimony was presented as to the amount of the decreased costs. Based upon the Debtors' testimony at trial, the court has made some adjustments to the Debtors' cash flow. Adjusting the Debtors' 1987 projected income for sheep from $5,000.00 to $10,000.00, a $5,000.00 gain in gross income occurs. However, by deleting the projected swine income of $17,220.00, a net loss of gross income of $12,270.00 occurs for 1987. Although no evidence was presented concerning decrease in expenses, the court will arbitrarily, for purposes of this discussion, decrease feed

expenses by $7,500.00. Thus, an additional decrease of $4,720.00 in the net farm income may occur for 1987. The 1988 projection for sheep income is already $10,000.00 on the cash flow, so the net effect of eliminating the hog income for 1988 is a decrease of $9,720.00 available for plan payments for that year.

The Debtors' plan is heavily dependent upon government farm program payments as are virtually all farm operations. Without the payments, the Debtors concede that their projections cannot be met. The Debtors are capable farm operators. Ronald Eisenbarth's contribution of labor and management under the plan would be significant. Without the Debtors' services and contribution of labor, the farm operation would have very little, if any, going concern value.

Based upon the Debtors' liquidation analysis, unsecured creditors in a Chapter 7 liquidation would recover nothing.

### Conclusions of Law

A proposed Chapter 11 plan of reorganization cannot be approved without meeting all requirements of section 1129(a) and without the approval of all impaired classes of creditors, unless the plan is capable of confirmation pursuant to section 1129(b), informally referred to as "cram down". *In re Hoff,* 54 B.R. 746, 750 (Bankr.D.N.D. 1985); 11 U.S.C. § 1129. Classes 5, 6, 7, and 8, consisting of the secured and unsecured claims of FLB and PCA, impaired creditors under the plan, have rejected the plan. Therefore, confirmation is only possible pursuant to section 1129(b). A plan may be confirmed under section 1129(b) if the plan does not discriminate unfairly and is fair and equitable with respect to each class of impaired claims which have not accepted the plan, and if all provisions of section 1129(a), except for sub-section 8, have been met. *In re Witt,* 60 B.R. 556, 559 (Bankr.N.D.Iowa 1986); 11 U.S.C. § 1129(b)(1).

FLB's strongest objection is that section 1129(a)(7)(A) and section 1129(b)(2)(A)(i), are not being complied with. Section 1129(a)(7)(A) provides that each impaired holder of a claim or interest must accept the plan or:

> will receive or retain under the plan on account of such claim or interest property of a value, *as of the effective date of the plan,* that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(7)(A)(ii) (emphasis added).

For a plan to meet the fair and equitable requirements of section 1129(b)(1), with respect to a class of secured creditors retaining their lien, such as FLB,

> each holder of a claim of such class [must] receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, *as of the effective date of the plan,* of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. § 1129(b)(2)(A)(i)(II) (emphasis added).

Alternatively, holders of secured claims must realize the indubitable equivalent of such claims. 11 U.S.C. § 1129(b)(2)(A)(iii).

▪ Both section 1129(a)(7) and 1129(b)(2)(A)(i)(II) refer to value "as of the effective date of the plan". The present value of a secured creditor's claim must be retained. *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 652–53 (11th Cir. 1983). When payments are made over time, the interest rate that is used determines whether or not the creditor is being paid the present value of its allowed secured claim. *In re Citrowske,* 72 B.R. 613, 617 (Bankr.D.Minn.1987). The Debtors propose to use a discount or interest rate of 9% in amortizing FLB and PCA's secured claims. However, FLB's variable rate on loans to customers, such as the Debtors, is presently 12.5%.

▪ The Eighth Circuit has on previous occasions provided that, in determining the present value of claims:

> [T]he appropriate discount rate must be determined on the basis of the rate of

interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payoff period, with due consideration for the quality of the security and the risk of subsequent default.

*United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986) (quoting *In re Monnier Brothers,* 755 F.2d 1336, 1339 (8th Cir.1985) (quoting 5 Collier on Bankruptcy ¶ 1129, at 1129–65)). The *Neal Pharmacal* court concluded that the bankruptcy court's sole reliance on a creditor's "cost of borrowing without consideration of the risks of nonpayment, the length of the payment period, and the existence of collateral is clearly contrary to the prevailing market rate approach referred to in *Monnier Bros.* and adopted by other courts that have considered the issue under section 1129(a)(9)(c)." *United States v. Neal Pharmacal Co.,* 789 F.2d at 1286. The language of section 1129(b)(2)(A)(i)(II) is virtually identical to the language of section 1129(a)(9)(C) addressed in *Neal Pharmacal,* and thus, this court considers the Eighth Circuit's pronouncement in *Monnier Bros.* and *Neal Pharmacal* to be controlling. The Debtors propose to pay FLB an interest or discount rate of 9% on its secured claim. However, FLB's rate for loans to customers, such as the Debtors, is currently 12.5%. An interest rate of 9% is not a fair market rate of interest and will not maintain the present value of FLB's secured claim.

■ The fair market value of FLB's collateral is $232,400.00. The Debtors attempt to retire their stock in FLB and reduce the value of FLB's secured claim by the amount of the Debtors' outstanding stock. FLB objects. This court believes it is improper for the Debtors to retire or cancel FLB stock as part of their Chapter 11 plan. *In re Walker,* 48 B.R. 668, 669 (Bankr.D.S.D.1985). FLB is given the *sole discretion,* under federal law, to cancel stock, and apply it to customer loans. 12 U.S.C. § 2034(a). Stock can only be cancelled at the direction of FLB, and cannot be cancelled upon the direction of the Debt-

ors. Moreover, this court cannot read section 1129(b) to override the specific intent of Congress, in enacting the Farm Credit Act, to design a capital structure dependent upon long term direct borrower participation. Thus, FLB's secured claim is $232,400.00, which if amortized over 25 years at 12.5% interest, would satisfy the requirements of section 1129(a)(7) and the fair and equitable requirement of section 1129(b). Annual payments would be $30,-663.66.

■ PCA and FLB both object that the plan is not feasible as required by section 1129(a)(11). In view of the finding that the value of FLB's collateral is $232,400.00, and that the proper discount rate should be 12.5%, the court concludes that the plan is not feasible. The Debtors project $24,-459.00 available for debt service in 1987. FLB's payment would be approximately $30,000.00. In addition, PCA's payments are set at $6,837.04 per year. If the secured portion of PCA's claim were reduced to $29,070.00, amortized at 12.56% for ten years, payments would be $5,263.42 per year. Thus, FLB and PCA's payments alone would exceed $35,000.00, without considering other payments for administrative expenses and other claims. Moreover, as discussed earlier, the amount available for plan payments would be further reduced by eliminating the projected swine income.

■ FLB also argues that the plan unfairly discriminates against its unsecured claim because trade and service creditors holding unsecured claims will be paid in full, while FLB and PCA will only be paid 10% of their unsecured claims. The Debtors attempt to draw a distinction between sophisticated institutions such as FLB and PCA, as contrasted to unsecured local trade creditors and service creditors. While the Debtors prefer to pay local businesses in full, as do many farmers, at the expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code. The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim. *In re*

*AOV Industries, Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986). An unsecured claim is simply that, an unsecured claim. No valid reason exists for treating the unsecured claims of FLB and PCA different than the unsecured claims of the trade creditors. *See In re Rochem Ltd.,* 58 B.R. 641, 643 (Bankr.D.N.J.1985) (discusses four part analysis in addressing question of unfair discrimination). The court is of the opinion that the proposed plan treatment does discriminate unfairly against FLB and PCA. *See In re Smeltzer,* 47 B.R. 77, 79 (Bankr. W.D.Wisc.1985).

 FLB also objects on the basis that the absolute priority rule, codified as section 1129(b)(2)(B)(ii) is being violated by the Debtors' plan. The absolute priority rule requires that "the holder of any [unsecured] claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property". 11 U.S.C. § 1129(b)(2)(B)(ii). Under the absolute priority rule, sole proprietors such as the Debtors, are prevented from retaining any equity or ownership interest in their property, unless all unsecured claims are paid in full, or substantial new capital is invested into the reorganized business. *In re Witt,* 60 B.R. 556, 559–60 (Bankr.N.D. Iowa 1986). The Eighth Circuit Court of Appeals recently addressed the absolute priority rule in the context of agriculture reorganizations in the case of *In re Ahlers,* 794 F.2d 388 (8th Cir.1986). The *Ahlers* decision expanded the exception allowing contribution of substantial new capital, providing that a farmer may contribute personal services in the form of labor and expertise as a substitute for the more traditional forms of capital. *In re Ahlers,* 794 F.2d at 402. In order to determine whether the absolute priority rule has been met, this court must resolve the question of "whether the farmer's new contribution is reasonably equivalent to the equitable ownership interest the farmer would retain under the plan." *In re Ahlers,* 794 F.2d at 404. Inherent in resolving this question is determination of the value of the farmer's contribution, as well as the valuing of the Debtors' proposed retained interest. Based upon evidence at the hearing, the court knows only that the Debtors' contribution of labor and management skills will be required if reorganization is at all possible, and that absent the Debtors' contributions, the property would have little or no going concern value. Although Ronald Eisenbarth is regarded as a good operator, the court presently has no way of knowing whether the value of the Debtors' contributions of labor and management, less withdrawals for living expenses, will equal or exceed the value of the retained ownership interest in the Debtors' farm operation upon maturity of the Chapter 11 plan. Therefore, the court must conclude that the Debtors have not met their burden of proof in establishing that the absolute priority rule is being complied with.

The plan also does not provide for payments of quarterly trustee fees as required by 28 U.S.C. § 1930(a)(6).

This case has been in bankruptcy for over two years. As should be obvious to the Debtors and counsel, the final hour of this case is fast approaching. Based upon the evidence before the court, the court believes that the Debtors have some real feasibility problems with their operation. If the Debtors sincerely believe their operation is viable, based upon the valuation and interest rates heretofore discussed, they must proceed most expeditiously to bring on an amended plan for hearing, and to update and further elaborate on their cash flow projections. This is not to say that the court would not rule adversely against the Debtors if a motion to dismiss were brought on prior to the time an amended plan would be considered. If, as it appears, the Debtors cannot propose a plan which would meet the feasibility requirements of Chapter 11, then reality should be faced. There is no point in extending these proceedings if, in effect, there is little or no chance of a successful rehabilitation.

Accordingly, and for the reasons stated herein, confirmation of the Debtors' Second Amended Plan Of Reorganization is DENIED.

IT IS SO ORDERED.