**In re ARN LTD. LIMITED PARTNERSHIP,**
Debtor.

**Bankruptcy No. 90–00814.**

United States Bankruptcy Court,
District of Columbia.

April 3, 1992.

Richard A. Gross, Washington, D.C., for debtor.

## DECISION REGARDING CONFIRMATION OF THE PLAN AND OBJECTION TO CLAIM OF SORRELL ASSOCIATES LIMITED PARTNERSHIP

S. MARTIN TEEL, Jr., Bankruptcy Judge.

On March 19, 1992, the court held a confirmation hearing concerning the debtor's amended plan of reorganization and a hearing concerning the debtor's objection to the claim of Sorrell Associates Limited Partnership ("Sorrell"). This decision constitutes the court's findings of fact and conclusions of law. Four principal issues are presented: the value of the debtor's real property, the propriety of the classification of certain claims, whether the plan unfairly discriminates against dissenting classes, and whether the plan is feasible.

The debtor, ARN LTD. Limited Partnership, filed its petition under Chapter 11 of the Bankruptcy Code (11 U.S.C.) on October 10, 1990. The debtor's sole asset of any substantial value is its leasehold interest in property known as the York Outlet Mall ("the Mall") including an option to purchase upon the lease's expiration. The Mall is located in York, Pennsylvania. The property is subject to a first leasehold mortgage in favor of York Bank & Trust Co. securing a debt which currently stands at $6.6 million. The Mall is also subject to a second leasehold mortgage in favor of Sorrell in the amount of $2.6 million plus accruals. Landau & Hyman, Inc. has offered to purchase the Mall for $4.297 million. The debtor's amended plan is founded on that proposed sale.[1] Under the

---

1. The debtor's original plan of reorganization was filed on August 22, 1991, and amended on October 25, 1991 (docket entry no. 119). It was further amended pursuant to a motion to amend the plan (attachment to docket entry no. 160). That motion was granted by this court's Order Approving Disclosure Statement, as Amended (docket entry no. 173). Finally, the plan was further amended at the hearing to provide for the purchaser to pay $4.297 million and for York to receive $3.967 million. Because $330,000 would be left after York is paid $3.967 million and prior versions of the plan would have left less than that after York was paid, creditors besides York cannot complain about any of these changes in the plan.

amended plan, York will receive $3.967 million and will release its lien in exchange for the payment. The $330,000 balance of the proceeds will go to administrative claims, § 507 priority claims, and general unsecured claims.

### Valuation of Mall

■ The Mall sits on an 11.72 acre tract on a busy commercial street. It has 132,360 square feet of gross rentable space, with two anchor tenant spaces. A Phar/Mor store occupies the smaller anchor tenant space on the north end of the building totalling 28,800 square feet. The other anchor tenant space, at the southern portion of the building, totalling 68,000 square feet, had been turned into an outlet mall but is now vacant. Daniel Wagner, a member of the Appraisal Institute of the American Institute of Real Estate Appraisers valued the property as worth $5 million as of October 11, 1990. That appraisal assumed that Phar/Mor would take over the larger anchor tenant space, the 68,800 square feet formerly devoted to an outlet mall. This is what Landau & Hyman, Inc., the proposed purchaser of the Mall also intends to do with the space. The sale is contingent on its signing a lease with Phar/Mor for the larger anchor tenant space. Wagner's appraisal assumed a rent of $6.35 per square feet; the proposed lease with Landau & Hyman, Inc. is at $6.20 per square foot. Wagner's appraisal, however, gave no consideration to the enhanced value the Mall would enjoy if existing tax free bond financing on the property of $5.7 million, at an attractive rate of interest, could be kept in place. The offer by Landau & Hyman, Inc. is contingent on receiving an opinion of counsel that the bonds, currently held by York, can be remarketed and on obtaining a letter of credit from a sound bank as a credit enhancement of the bonds. In the opinion of Phillip Schoenberger of Landau & Hyman, Inc., the tax free bond feature adds $1.9 million to the value his company is willing to pay. The Landau & Hyman, Inc. offer is also contingent on execution of a lease with Food Lion for the smaller anchor tenant space that Phar/Mor would vacate at the end of 18 months. Wagner's appraisal assumed that the smaller anchor tenant space would be occupied on an "as is" basis by a new tenant at $6.50 per square foot within two years. The proposed lease with Landau & Hyman, Inc. is at $7.85 per square foot "service net" after substantial reconstruction over a period of 15 months.

The bid by Landau & Hyman, Inc. was received only after extensive marketing of the property at $4.5 million. The debtor itself contacted some 30 prospective purchasers and asked the management of Sorrell Associates, holder of the second lien on the mall, for prospects. The debtor received a second offer in the low $3 million range by Meredith Olsen who felt she could not obtain a letter of credit to back reissuance of bonds and who accordingly proposed to do the deal without bonds. No other offers were received. Since October of 1990 the debtor has attempted to obtain a backup contract and has been unable to obtain one. The apparent decline in value since 1990 may be attributed to the general decline in commercial real estate. According to Schoenberger, there are thousands of properties available like the mall throughout the country, although this one is unique because of its tax-free bond feature. In addition, the substantial capital investment of over $2 million required to renovate the two anchor tenant spaces may explain the limited number of bidders on the property.

Sorrell, the junior lienor, contended that the value is greater than the $4.397 million offered. Because the bank holds a lien of $6.6 million, it is only necessary to address whether the evidence adduced demonstrates a value in excess of $6.6 million. It does not. Sorrell called Simon Hershon of Interbank Consultants, Inc. as a witness. Hershon is not a real estate appraiser but is experienced in real estate turnarounds, with a masters in business administration and a doctorate in finance and organizational behavior. His "valuation" of the property turned on his views of a possible reorganization in which the debtor would obtain a $2 million superpriority loan at 8.5% to undertake the renovations required

by Phar/Mor and Food Lion. His projections include the assumption that there would be no tenant improvements and leasing commission expenses over a ten year period beyond that covered by the $2 million superpriority loan. But Schoenberger testified that he anticipated it would take $8.3 million to rebuild the mall, get it fully rented, and resell the bonds. The court has to credit Schoenberger on this score because he has extensively reviewed the costs of renovation, leaseup, and reselling of the bonds. Hershon did assume that reselling the bonds would entail some costs and added .8% to the existing 5.7% interest rate on the first deed of trust secured by the bonds to take this into account. However, this spreads out the cost instead of acknowledging that some up-front costs would be incurred. Moreover, Hershon only spent 4 to 6 hours in analyzing the question. This does not compare favorably with the many hours that Schoenberger has spent in evaluating the mall's potential.

Further, Hershon testified that he projected a value of $8 to $10 million *in 1993*, assuming his envisioned plan was in place. If that plan were in place, he believes that the value of the property is $8 million *today*. Without that plan in place, he placed a value of $6 or $7 million on the property. Critical to the $8 million value would be that the two anchor tenants have signed leases *and* that a superpriority lien has been authorized. No lender has offered to make superpriority financing available, although the value of the property would likely invite a $2 million superpriority loan at a favorable interest rate. Whether 8.5% is a reasonable estimate is uncertain. Any superpriority loan would entail closing costs as well and the expense of litigating the question whether York could be forced to have a superpriority loan placed ahead of it. There is no willing buyer in place ready to purchase the property if these conditions are met.

In contrast, the debtor has a buyer in place who does not insist on superpriority financing, albeit subject to conditions the debtor believes could be met within 60 days. The debtor's proposed sale has been tested in the crucible of offering the Mall on the market. The sophistication and financial backing necessary to enter into a deal involving complicated tax free bond financing is a factor that may require a discount to the purchase price. Hershon's "valuation" of the property may entail assumptions about the existence of willing buyers, and the amount they would be willing to spend on a transaction of this complicated nature, that would not be borne out by the actual pool of potential buyers. The debtor's proffered plan has been tested against the market and Sorrell's has not. Although Schoenberger is obviously an interested witness, he testified under oath concerning the value to investors such as his company of a property of this nature and was convincing in his explanations of the expected return.

In these circumstances, the debtor has established that the Mall is worth no more than the $6.6 million first lien that York holds against the property. Accordingly, the lien of Sorrell shall be declared void under 11 U.S.C. § 506(d).

*General Confirmation Issues*

Confirmation of the plan is governed by 11 U.S.C. § 1129. I will discuss § 1129(a)(1) in conjunction with the discussion of § 1129(b). The plan complies with paragraphs (2), (3), (4), (5), (6), (12), and (13) of § 1129(a).

I turn now to § 1129(a)(7). In addition to owning the Mall, the debtor has a claim for a portion of unpaid taxes owed by Phar/Mor, Inc. of $20,589.18 and funds in the debtor in possession's account of $23,214.59. Finally, the debtor owns claims against tenants for unpaid rents. None of the creditors assert that these rent claims are of any substantial value. Because I find that the real property is worth less than York's $6.6 million lien claim, the $330,000 to be generated for administrative claims, priority claims, and unsecured claims exceeds the amount that would be available if the estate were liquidated. Accordingly, the plan meets the so-called "best interest" test of § 1129(a)(7).

With respect to § 1129(a)(8), two classes have rejected the plan and this will necessitate discussion later of § 1129(b). York attended the confirmation hearing through counsel and appeared to accept the plan, but the amendments had not been reduced to writing. The court will require a written acceptance before binding York to the amended plan. I will assume, however, that such acceptance would be promptly forthcoming if necessary to confirm the plan.

With respect to § 1129(a)(9), the plan provides for payment in full in cash or as otherwise provided in the Bankruptcy Code as soon as practicable after the effective date or on the dates that such claims are finally determined, whichever occurs later. The debtor has no wage claimants and no other non-tax priority claimants. With respect to the tax priority claimants, however, the plan fails to expressly provide payment of interest after the effective date of the plan to assure that the payments on the claim are equal in value, as of the effective date of the plan, to the allowed amount of the claim. § 1129(a)(9)(C). The court assumes that this is contemplated by the debtor's provisions that the claim shall be paid "as otherwise provided in the Bankruptcy Code" but the language of the provision is ambiguous and the court will require an amendment before the plan can be confirmed.

With respect to § 1129(a)(10), (requiring acceptance by at least one impaired class), two classes originally accepted the plan, Class One (York's claims) and Class Five (most unsecured claims). Thus, § 1129(a)(10) is satisfied.

I next address whether the plan properly classified claims (see §§ 1122 and 1129(a)(1)) and, if so, whether § 1129(a)(8) bars confirmation because unfair discrimination between classes makes § 1129(b)(1) inapplicable. Additionally, confirmation requires a showing of feasibility, § 1129(a)(11), and I address that last.

*Classification of Class Four Containing Sorrell and Lee Antonelli Claims*

■ The plan classifies unsecured claims besides York's into three separate classes.

Class Three consists of the claims of all undisputed general unsecured creditors. Class Four consists of claims of certain unsecured creditors who are considered to be related to the debtor. Class Five consists of certain disputed claims.

Class Four consists of the claims of Sorrell, Lee Antonelli, and of the officers and directors of the debtor's general partner. Both Sorrell and Lee Antonelli have objected, first, that under § 1122 it is improper to classify them apart from general unsecured creditors and instead with insiders and, second, that the plan unfairly discriminates. Nothing in § 1122 prohibits the separate classifications. *Barnes v. Whelan*, 689 F.2d 193, 201 (D.C.Cir.1982) (§ 1122(a) "does not require that similar claims *must* be grouped together, but merely that any group created must be homogen[e]ous").

In *In re AOV Industries*, 792 F.2d 1140 (D.C.Cir.1986), both the majority and the dissenter noted the bankruptcy court's broad discretion in questions of classifications. *AOV Industries*, 792 F.2d at 1154 and 1156. The court in *AOV Industries* addressed the question of whether the claims of the creditor Holley could be placed in the same class as all other general unsecured creditors. Holley pointed to a third party's guarantee of his claim against the debtor *AOV*. The precise issue presented under § 1122(a) was whether Holley's claim was substantially similar to other claims in the class. Holley had to show that others in his class had "disparate claims." *Id.* at 1150. It was in this context that the court of appeals observed that "the focus of the classification is the legal character of the claim as it relates to the *assets of the debtor.*" *Id.* (emphasis in original, citation omitted). The claims Holley had against guarantors were irrelevant because they did not change the nature of Holley's claim against the assets of the estate. The court of appeals then observed in *dicta* that—

while there is no restriction on the total number of classifications, logistics and fairness dictate consolidation rather than proliferation of classes, so long as they

are internally homogeneous. *Scherk v. Newton*, 152 F.2d 747, 751 (10th Cir.1945) ("All creditors of equal rank with claims against the same property should be placed in the same class." (footnote omitted)).

*Id.* at 1151. Thus, *AOV Industries* suggests that the legal character of a claim against the estate's assets is critical and that equality of rank is an important consideration in classification questions.

The classification of Sorrell's and Lee Antonelli's claims with other Class Four claims appears proper because no showing was made that the legal nature of the class members' claims against the estate were of a dissimilar nature. I find it unnecessary to resolve the parties' arguments over whether Sorrell and Lee Antonelli were insiders.[2] Resolution of that dispute would not alter the similar legal character of the claims against the estate because no showing has been made that any insiders' claims should be subordinated under 11 U.S.C. § 510(c).

■ But I need not rest my decision on whether the claims were similar. Class Four rejected the plan. Even if the classification of Sorrell and Lee Antonelli with other claimants in Class IV was erroneous, the error was harmless. Both Sorrell and Lee Antonelli have voted to reject the plan. Had they been classified separately from the other Class IV claimants, "the result would simply have been two rejecting classes rather than one." *In re 11,111, Inc.*, 117 B.R. 471, 477 (Bankr.D.Minn. 1990). Accordingly, whether these two creditors were properly lumped together with the other Class Four creditors in violation of § 1122(a) is not a germane issue. *Id.* The real issue is whether Class Four's worse treatment than general unsecured creditors in Class Three can be justified, that is, whether the plan unfairly discriminates under 11 U.S.C. § 1129(b)(1).

*Question of Unfair Discrimination Against Class Four*

■ Class Four is to receive the right to pursue rent claims the debtor has against former tenants. The debtor showed no value to these rent claims and hence they must be viewed as worthless. In contrast, Class Three is receiving after payment of administrative and priority claimants, the residue of the $330,000 left from the sale for non-secured claim holders. The anticipated percentage dividend is substantial. Sorrell and Lee Antonelli assert that this is unfair discrimination under § 1129(b)(1).

In this circuit, there are two controlling decisions concerning the question of unfair discrimination under § 1129(b)(1), *Barnes v. Whelan* (albeit dealing with Chapter 13 in which no voting is allowed) and *AOV*

2. That dispute is as follows. Sorrell holds a 50% interest in the debtor as a limited partner. Pursuant to the agreement of limited partnership of the debtor, paragraph 11.2, the consent of Sorrell was necessary before the general partner could cause the partnership to:

(i) Redeem and refinance the Bonds by exercise of the right of the lessee under the Second Lease Agreement to pay in full all amounts due with respect to the Bonds and to subsequently purchase the Property for One Dollar ($1.00).
(ii) Sell, transfer, refinance or otherwise dispose of the Property at any time after title to the Property is acquired pursuant to (i) above.
(iii) Sell, assign, refinance or further encumber the Leasehold Mortgage.
(iv) Change the Person or entity managing the Property.

Although not a general partner in name, the debtor urges that Sorrell's veto power placed it in control of certain decisions of the debtor.

The debtor further points to Sorrell's power to propose a new lender to refinance the loan. Sorrell argues that these powers are no different than protection frequently accorded a lien creditor. The debtor next emphasized that Sorrell's controlling partner, Domenic Antonelli, Jr., vetoed a financing plan that would have infused $1.4 million into the debtor from York on the condition that Sorrell subordinate its claim and that certain guarantees be granted. Antonelli indicated that the debtor would have to file bankruptcy. Moreover, Sorrell had access to financial data of the debtor pursuant to the terms of the limited partnership agreement. The debtor urges that in comparison to general trade creditors, Sorrell had an inside track for purposes of gauging its investment in the debtor. Lee Antonelli is the daughter of Domenic F. Antonelli, Jr. and if Sorrell is an insider the debtor urges that she is as well based on this relationship. *See* 11 U.S.C. § 101(31)(C)(ii) (insider includes "relative of a ... person in control of the debtor").

*Industries.* In *Barnes* the court of appeals stated (689 F.2d at 201):

> Clearly some difference in treatment between classes is permissible, or there would be little point in creating separate classes in the first place. The limits of permissible discrimination, however, are undefined. [The debtor] argues that a plan does not violate section 1322(b)(1) [the Chapter 13 analog to § 1129(b)(1)] so long as a rational basis exists for the classifications, and each class of unsecured creditor receives more than it would in a Chapter 7 liquidation.... Some bankruptcy courts have applied similar criteria. *See e.g., In re Sutherland,* 3 B.R. 420 (Bkrtcy.W.D.Ark.1980). Nonetheless, we cannot agree with [the debtor's] formulation. Section 1322(b)(1) prohibits unfair discrimination, and an inquiry into fairness plainly involves more than the rationality of the debtor's classifications or some minimum amount creditors must receive.
>
> What constitutes fair discrimination will vary from case to case, and we cannot offer a generally applicable definition. The court must examine the amounts proposed for each class in light of the debtor's reasons for classification, and exercise sound discretion. *See In re Gay,* 3 B.R. 336 (Bkrtcy.D.Colo.1980).

In *Barnes* the court held that a 99 percent differential in the amounts paid on co-signed versus non-co-signed debts was unfair discrimination because the debtor failed to show that he would be unable to carry out his plan if co-signed obligations were not paid in full and raised no other factor "that might justify departure from the *basic principle that all unsecured creditors should be treated alike.*" *Id.* at 202 (emphasis added). The court directed the bankruptcy court on remand to assess the fairness of any difference in treatment between unsecured creditors "considering the circumstances in the debtor's offered justifications." *Id.* In *AOV Industries* the court did not deal with a question of unfair discrimination. Rather, the question presented was whether under § 1122 the claimant was properly placed in the same class as certain other creditors and whether, if so, the creditor was receiving treatment equal to that treatment accorded other members of the same class. However, *AOV* has been cited as being of relevance to the question of unfair discrimination. *See In re Eisenbarth,* 77 B.R. 228, 235–36 (Bankr.D.N.D.1987).

On first inspection by this court, this case seemed similar to *In re LeBlanc,* 622 F.2d 872 (5th Cir.1980). There the court made the general observations that classification in the plan should not do substantial violence to any claimant's interest and that the debtor could not pick and choose who would be affected by a plan except by reasonable classifications. *Id.* at 879. The court nevertheless confirmed the plan which separately classified trade creditors' claims and insiders' claims. *Id.* The plan provided that the insider class—partners of the debtor, members of a partners' immediate family, and any entity owned or controlled by any such insider—would receive nothing under the plan. *Id.* at 875. The appellant, as an unsecured creditor and brother of the general partner of the debtor, was in the insider class. The court upheld the discriminatory classification. First, it observed that there was no equity in the debtor's property for distribution to unsecured creditors. Thus, there would have been nothing for unsecured creditors in a liquidation. Second, the majority of insiders did not object to the plan's classification scheme. Third, the trade creditors had advanced goods and services to the debtor without knowledge of the debtor's financially perilous condition and without any real opportunity to protect themselves. Maintenance of good relations with trade creditors were desirable to the plan proponents who were operating a hotel necessitating further trade creditor relations. The insiders, in contrast, made loans to the debtor when they were in a position to know of the debtor's financial condition. Nevertheless, I conclude that *LeBlanc* is not controlling here.

■ *LeBlanc* is distinguishable for several reasons. First, *LeBlanc* was decided under the Bankruptcy Act and the court cited a case holding that when there is no

liquidation value for unsecured creditors after secured creditors are paid, the unsecured creditors have no place in a Chapter XII proceeding. That reasoning has been rejected under the Bankruptcy Code. The question of liquidation value is addressed by § 1129(a)(7). The question of discriminatory treatment of a class, in contrast, is addressed by §§ 1129(a)(8) (the class can accept the plan) and 1129(b)(1) (a dissenting class must not be discriminated against unfairly). The debtor has been able to extract $330,000 from what would otherwise go to the secured creditor York in this case. How that $330,000 is divided up amongst the unsecured creditors (after payment of administrative creditors) necessarily is a question upon which even an insider creditor class is entitled to be heard. To hold that the absence of any liquidation value for unsecured creditors justifies the discriminatory treatment would improperly write § 1129(b)(1) out of the Code. *See In re Furlow*, 70 B.R. 973, 976 (Bankr.E.D.Pa. 1987) (criticizing similar reasoning that would write § 1322(b)(1) out of the Code).

■ Second, the treatment of Class Four amounts to equitable subordination. No showing was made that any of the debtor's rent claims against tenants have any value and hence Class Four must be viewed as receiving nothing. This cannot be justified on grounds of equitable subordination because the necessary elements for equitable subordination under 11 U.S.C. § 510(c) were not shown. *LeBlanc* viewed the doctrine of equitable subordination as inapplicable because it only applies to distribution of the debtor's assets and the payments to unsecured creditors were not coming from estate assets—from which no distribution to unsecured creditors was available—but from the plan proponents who were purchasing the debtor's assets. But here the plan proponent is the debtor and there is no showing that the purchaser, Hyman & Landau, Inc., has insisted on paying something to general trade creditors as opposed to other creditors.

Third, no showing has been made—other than bald speculation—that the purchaser needs to maintain good relations with general trade creditors and insisted on a payment to them as a term of the purchase. Even were such a showing made, the question would remain whether and to what extent it is fair to let the purchaser dictate how the debtor's estate's value is to be divided up. There is no showing that the $330,000 is a good will component the purchaser has offered in addition to the value of the property being purchased. In *LeBlanc*, in contrast, the purchasers were paying more than the value of the property.

■ Fourth, there has been no showing that when insiders lent money to the debtor that they did so with superior knowledge of the risks involved to the extent that they ought to be discriminated against. If a claimant is an insider, the party seeking to equitably subordinate the claim has the burden of presenting "material evidence of unfair conduct" before the insider need show the fairness of his conduct in defending against equitable subordination. *In re Holywell Corp.*, 913 F.2d 873, 880–81 (11th Cir.1990).

Fifth, Sorrell and Lee Antonelli, in any event, were never in day-to-day control of the debtor. Although they had the right of access to the debtor's records and had the right to be kept apprised of the debtor's financial circumstances, they differed little in this regard from sophisticated lenders. There is no evidence they used such rights to unfair advantage. As stated in *Eisenbarth*, 77 B.R. at 235–36:

The Debtors attempt to draw a distinction between sophisticated institutions such as FLB and PCA, as contrasted to unsecured local trade creditors and service creditors. While the Debtors prefer to pay local businesses in full, as do many farmers, at the expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code. The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim. *In re AOV Industries, Inc.*, 792 F.2d 1140, 1150 (D.C.Cir. 1986). An unsecured claim is simply that, an unsecured claim. No valid reason exists for treating the unsecured

claims of FLB and PCA different than the unsecured claims of the trade creditors. *See In re Rochem Ltd.*, 58 B.R. 641, 643 (Bankr.D.N.J.1985) (discusses four part analysis in addressing question of unfair discrimination).

Although the reasoning of *LeBlanc* was applied in *11,111, Inc.*, 117 B.R. at 478, this case is distinguishable and *11,111, Inc.* is unpersuasive in applying *LeBlanc* under the Bankruptcy Code.

■ The case of *In re Rochem, Ltd.*, 58 B.R. 641 (Bankr.D.N.J.1985), cited in *Eisenbarth*, followed the four-pronged test of unfair discrimination set forth in *In re Ratledge*, 31 B.R. 897, 899 (Bankr. E.D.Tenn.1983):

> (1) Whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without such discrimination; (3) whether such discrimination is proposed is good faith; and (4) the treatment of the class discriminated against.[3]

Applying that test here does not warrant the discriminatory treatment of Class Four.[4] Separate classification on the basis of the insider or equity holder status of the creditor does not alone warrant unequal treatment unless equitable subordination principles apply. *In re Holywell Corp.*, 913 F.2d at 880 (that a claim is held by an equity security holder does not justify its subordination and insider claims may be equitably subordinated only based on evidence of unfair conduct). There has been no showing that the insiders and equity security holders used superior knowledge concerning the debtor's affairs in an unfair manner. No sound justification for the discrimination has been advanced. The debtor only proffers the purchaser's presumed interest in the continued good will of general trade creditors. But no showing was made that the purchaser insisted on

payment of general trade creditors. Thus, under the four part test of *Rochem* and *Ratledge* the discriminatory treatment cannot be justified.

### Treatment of Class Five

■ The court's holding that Class Four has been unfairly discriminated against applies with equal force to Class Five which is to receive nothing under the plan. This class consists of the claims of tenants of the debtor who have asserted sizeable claims against the debtor for interference with their rights as tenants and breach of their lease agreements. The court has under consideration a motion for summary judgment concerning the debtor's objection to these claims and is convinced that the claims are inflated. That the claims are disputed, however, is not a justification for the discriminatory treatment. *See In re Weiss–Wolf, Inc.*, 59 B.R. 653, 655 (Bankr.S.D.N.Y.1986). Moreover, that the claims greatly exceed other general trade claims is no basis for discriminatory treatment: whatever the amount of the Class Five claims, they are entitled to equal treatment in the absence of a justification for discrimination. Finally, as in the case of Class Four, there has been no sound justification for the discriminatory treatment. That the debtor views the claimants as disgruntled tenants who are a nuisance to the debtor's reorganization efforts is simply not a basis for such discrimination, and no showing has been made that the plan could not succeed were the Class Five creditors accorded the same treatment as Class Three creditors. Although *In re Rochem, Ltd.*, 58 B.R. at 643, would support the discriminatory treatment here, I find *Rochem* unpersuasive. There the court acknowledged the four-part test of *Ratledge* but misapplied that test. It looked to the

---

**3.** The fourth element was described in *In re Wolff*, 22 B.R. 510, 512 (B.A.P. 9th Cir.1982), as "whether the degree of discrimination is directly related to the basis or rationale for the discrimination ..." that is, "does the basis for the discrimination demand that this degree of differential treatment be imposed?"

**4.** The court does not necessarily embrace the four-part test and notes that it has been criti-

cized. *In re Furlow*, 70 B.R. 973, 977–78 (Bankr. E.D.Pa.1987) (criticizing test and stating that appropriate test is that "different treatments is appropriate if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan"). *See also In re 222 Liberty Associates*, 108 B.R. 971, 991–92 (Bankr.E.D.Pa.1990) (reciting *Furlow* test and following *Eisenbarth*).

differences in the claims as justifying the discriminatory treatment: disputed tort claims versus undisputed general trade claims. 58 B.R. at 643. But the proper focus is the legal stature of the claims against the debtor's assets and both trade claims and tort claims enjoy equal standing against the debtor's assets. The court in *Rochem* then held that the hugely diminished dividend that general unsecured trade creditors would receive were they classified with the tort claims would constitute unfair treatment of the trade creditors. But a pro rata distribution necessarily assures that there is equality of distribution: that a larger claim receives a greater amount is not an unfairly disproportionate distribution. Accordingly, I conclude that Class Five has been unfairly discriminated against.

### Feasibility of Plan

■ The plan is dependent on the conditions being satisfied that the purchaser insisted on. Whether those conditions will be met is entirely uncertain although the purchaser has obviously been attempting to meet them and is relatively confident they will be met. The plan is open ended. The purchaser, Landau & Hyman, Inc., is not presented with a deadline for closing. The debtor suggested at closing argument that it was agreeable to the court's imposing a 60-day deadline.

On the evidence, the feasibility test of § 1129(a)(11) has not been met. If, however, the plan passed muster on all other issues, the court would be inclined to keep the record open for a period of 60 days to allow the debtor to introduce further proof that the conditions have been met and the purchaser is able to perform.

### Conclusion

Based on all of the foregoing, confirmation of the debtor's plan will be denied.