**In re KELLOGG SQUARE PARTNERSHIP, Debtor.**

**Bankruptcy No. 3–92–5211.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Oct. 22, 1993.

---

344

Michael L. Meyer, Ravich, Meyer, Kirkman & McGrath, Minneapolis, MN, for debtor.

Dennis J. Ryan, Stephen M. Mertz, Faegre & Benson, Minneapolis, MN, for Prudential.

## ORDER DENYING CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on May 4, 13, and 20, and June 3, 1993, for the hearing on confirmation of the Debtor's plan of reorganization. The Debtor appeared by its attorney, Michael L. Meyer. The Prudential Insurance Company of America ("Prudential") appeared by its attorneys, Dennis J. Ryan and Stephen M. Mertz.

Upon the evidence adduced over the course of the hearing and the pre- and post-hearing briefs and arguments of counsel, and upon the disposition of four motions made by Prudential and the Debtor in connection with the confirmation proceedings, as set forth in separate orders entered today, the Court denies confirmation.

## HISTORY AND MAKEUP OF DEBTOR

The Debtor is a Minnesota general partnership. It was formed in 1977 by Antonio Bernardi to acquire Kellogg Square from Kellogg Square Company, an affiliate of Prudential. Kellogg Square is a block-sized parcel of developed commercial real estate at the intersection of Kellogg Boulevard and Robert Street in downtown St. Paul, Minnesota. The members of the partnership originally included Bernardi; Sentinel Management Company ("Sentinel Management"), a corporation through which Bernardi does business in real estate development and ownership; and a group of European investors. Over time, the Bernardi family business interests acquired the outstanding partnership shares in the Debtor; by early 1992, the Debtor was owned by Antonio Bernardi individually, to the extent of a 0.1 percent share, and by Aurora Investments Limited Partnership, an entity in which Bernardi's children were the principals. Shortly before the commencement of this case, Bernardi divested himself of his ownership interest in the Debtor.

The Debtor has owned, and Sentinel Management has managed, the property since the acquisition in 1977.

## PROCEDURAL POSTURE OF CHAPTER 11 CASE

The Debtor commenced this case by filing a voluntary petition under Chapter 11 on September 28, 1992. During the case, it has remained in possession. It has continued to use the revenues generated from its assets in the ordinary course of business pursuant to several court-approved cash collateral stipulations with Prudential.

On March 5, 1993, the Debtor filed a modified[1] plan of reorganization. By an order entered on the same date, the Court approved the Debtor's amended disclosure statement. The Debtor then disseminated the modified plan, with the amended disclosure statement and a ballot, to all creditors and parties in interest to the case. The modified plan is now before the Court for the proceedings on its confirmation.

Prudential is the Debtor's sole scheduled secured creditor, and the only secured creditor whose claim is treated under the plan. It provided the Debtor with the financing for the 1977 purchase. The debt is evidenced by the Debtor's December 1, 1977 non-recourse note, in the original principal amount of $10,-000,000.00; it is secured by perfected liens against the real and personal property described in a mortgage instrument, and an assignment of the rents derived from the property, both executed by the Debtor on December 1, 1977.

Prudential timely objected to confirmation on a number of stated grounds, and cast a ballot rejecting the plan. All of the evidence received during the three-plus days of the confirmation hearing went to the issues it raised in its objection to confirmation.

### PROVISIONS OF DEBTOR'S PLAN

The Debtor's modified plan treats four classes of pre-petition claims.

The plan provides that claims in two classes are unimpaired: Class I, being the claim of Ramsey County for all past-due real estate taxes chargeable against the Debtor's property, and Class IV, being the ownership interests held by the Debtor's partner or partners.[2] As to Class III, the class of unse-cured creditors, the plan proposes a payment in full via eight equal monthly installments.[3]

Class II consists of Prudential's claim. The plan sets forth two alternate treatments. In them, the Debtor essentially gives Prudential a choice between proposed restructurings of its claim, which is to be exercised by Prudential's vote on the plan. In the event of a rejection by Prudential, the plan provides for:

1. A cash payment to Prudential to be made on the Effective Date of the plan, in an amount equal to balance of the amount of its allowed claim above the sum of $10,500,000.00.

2. Further payments totalling $10,500,-000.00, with interest at a flat rate of 8.5 percent per year, to be made in monthly payments calculated via a 30–year amortization, with a "balloon payment" of all outstanding principal and interest to be made on the twentieth anniversary of the Effective Date. This $10,500,000.00 obligation was to be evidenced by a new note, to be executed by the Debtor by the Effective Date.

3. Security for the full amount of Prudential's allowed claim, by continuing in force and effect the terms of the original real estate mortgage and assignment of rents that the Debtor gave to Prudential in 1977.

Under this alternative, the Debtor would retain the right to continue to prosecute certain litigation against Prudential. The lawsuit, brought against Prudential as the agent of Kellogg Square Company, is pending in the United States District Court for this District. It was commenced after the Debtor's Chapter 11 filing, though apparently the Debtor had contemplated suing out the claim before

---

1. The Debtor's counsel titled this version of his client's plan an "amended" plan. Under the terminology fixed by 11 U.S.C. § 1127 and FED. R.BANKR.P. 3019, any change in a filed Chapter 11 plan is a "modification." Generally, in Chapter 11 cases the term "amendment" is applied only to changes to filed *disclosure statements*. (Even then, FED.R.BANKR.P. 3017(a) uses the term "modifications" to denote post-filing changes.)

2. Under the plan, the County's claim for real estate taxes will be paid in full in its allowed amount in cash on the Effective Date of the plan, and the partner(s) will retain all pre-petition interest(s) in the Debtor.

3. Under the terms of the plan, these payments were to commence on May 15, 1993. Because Prudential rejected the plan and raised its involved objections to confirmation, the Court was not even able to conclude the confirmation hearing until almost three weeks after that date. If it submits another modified plan in response to the present order, the Debtor will have to change the date on which it proposes to commence payment of Class III claims.

then. In the lawsuit, the Debtor seeks to recover damages from Prudential, on the basis of its allegation that Prudential committed certain acts and/or omissions as to the disclosure of the presence of asbestos-containing materials in the improvements to the property when Kellogg Square Company sold it to the Debtor.[4]

The Debtor proposes to implement the plan via a capital contribution in the sum of $650,000.00 from its partner(s), to be made on the Effective Date. The capital contribution would be applied first to pay outstanding real estate taxes under Class I, and then to reduce the balance of Prudential's claim pursuant to Class III. Any funds not so expended would be placed into a "Segregated Fund." The Debtor then could draw on this fund as needed to pay operating expenses to the extent revenues were not sufficient, the expenses of the continuing litigation against Prudential, and any costs of remediating "the Building's asbestos problem."

As to executory contracts, the plan proposes to assume various outstanding contracts with vendors of services for operations; the Debtor's management contract with Sentinel Management; and the unexpired lease of a parking facility in the building. The plan also provides for the rejection of the Debtor's executory contract with District Energy St. Paul, Inc. ("District Energy") for the provision of hot water ·for heating purposes, and for the entry into a new contract with District Energy for the provision of the same service.[5]

## DISCUSSION

Prudential's objection to confirmation raises eight main issues. The threshold issue, and the one to which the great majority of evidence was directed, is factual: the valuation of the real estate and building that are the Debtor's single asset.[6] The resolution of this issue affects the conclusion on several of the remaining issues, all of which involve disputes of both fact and law.

### I. Valuation

#### A. Findings of Fact.

The Debtor's sole asset is a square city block of real estate, located (as noted earlier) in downtown St. Paul. The real estate is improved by a 32–story building, built in 1973. Throughout its existence, the building has been committed to mixed uses, both residential and commercial. It contains 450 residential apartments and townhouse units, approximately 425 of which are currently leased or available for long-term occupancy and approximately 25 of which are currently available for "corporate" use—that is, short- to medium-term occupancy by visiting employees, contractors, etc., under leases to local business concerns. The building also contains approximately 48,000 square feet of

---

4. Under the alternative treatment, the Debtor would give a general release of this claim and, apparently, all other claims it has against Prudential and Kellogg Square Company. In addition, the Debtor would make a larger cash payment on the Effective Date, to reduce Prudential's outstanding claim to the sum of $9,633,-130.68. The remaining claim would be paid over a 20–year term, with interest at the flat rate of 4.68 percent per year for 12 years, and then at a variable-but-capped rate for the remainder of the term. Prudential would retain its 1977 collateral security rights under this alternative also.

5. The incidents of the old and new contracts with District Energy are discussed at length in today's memorandum order denying Prudential's motion for designation of District Energy's ballot under 11 U.S.C. § 1126(e).

6. The framers of the Bankruptcy Code recognized that the value of particular assets is not a constant in a complex, changing economy. They

fully contemplated that the Bankruptcy Court would determine value on a case-by-case basis, focusing on the use of the property that is most relevant to the procedure at bar. *In re Bergh,* 141 B.R. 409, 419 (Bankr.D.Minn.1992).

'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interest in the case.

H.R.REP. No. 595, 95th Cong. 1st Sess. 356 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6312.

While courts will have to determine value on a case-by-case basis, [11 U.S.C. § 506(a)] makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property.

S.REP. No. 989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, 5854.

commercial space, adaptable for retail or office use, located on its first and second floors. Approximately 70 percent of the commercial space is under lease at present. Finally, the building has an attached 598–stall parking garage facility.

On the issue of the property's value, both sides presented the testimony of professional appraisers who were qualified as experts; Maxwell O. Ramsland testified on behalf of the Debtor, and Roger G. Lunz testified on behalf of Prudential. In their prefatory testimony both witnesses acknowledged the standard methodology for appraisal, which contemplates the calculation of value by three different methods, and a final opinion reached by assigning appropriate weight to the three preliminary results according to the purpose for which the opinion is given. They both agreed that, due to the nature of the subject as investment property, the income method was the one to be given most weight, with the cost method to be applied to a limited degree as a control and possible verification of the income method.[7]

As Ramsland testified, the theory for the income method assumes that an investor-buyer identifies two components of value for an investment in real property it is considering for purchase and retention as an income-generating asset.

The first component is the present value of the net revenue to be generated from the property over the period for which the buyer intends to hold it. This component is analogous to the worth attributed to publicly-traded corporate stock for its dividend-earning potential. The appraiser calculates it from projected cashflows, by applying a discount rate that corresponds to the rate of return that the buyer wishes to achieve on its investment.

The second component is the value of the "reversion" of the property—that is, the present value of the anticipated net realization from the investor-buyer's future sale of the property, after it has held it for the assumed period. This component is analogous to the worth attributed to stock on account of the anticipated increase in its capital value. The process for determining it is somewhat more involved. The first stage is to identify the amount of the future net realization. The appraiser first must determine the anticipated gross sale price of the property. The means for doing this assumes that the hypothetical future purchaser is also interested in "purchasing cashflow," and will value the building according to its revenue potential. The appraiser first projects the net operating income from the property for the year immediately following the hypothetical future sale. He then identifies a capitalization rate that he deems appropriate for the property and the nature of the investment in it, and applies this rate to the projected future revenue. This conversion of cashflow into a capital value is deemed the gross price to be had from the hypothetical future sale. Once this price is determined, the appraiser reduces it by certain costs and deductions attributable to the event of sale, to arrive at a net realization from sale. The appraiser then calculates the present value of the net realization, again by applying a discount rate that reflects the rate of return desired by the investor-buyer.

As Lunz and Ramsland both opined, the total of these two components is the indication of value by the income method.

Both witnesses testified at length as to the data they used and the assumptions they made in reaching their respective opinions. In the final analysis, both appraisers' formal written reports contain enough flaws that one cannot exclusively rely on one or the other for fact-finding on the ultimate issue. Lunz's two-volume written report recapitulates his investigation and thought process in impressive detail; however, he did not follow standard methodology in one phase of his calculation under the cost method[8], and he

---

7. Both witnesses also agreed that the market valuation method had very little utility in this case, due to a relative lack of underlying data. Lunz found that only three comparable mixed-use properties within a radius of two miles of the subject had been sold in the preceding two years, all under distressed conditions—i.e. they were sold by financial institutions that had acquired them through foreclosure of their mortgages.

8. As Ramsland pointed out, Lunz calculated the impact of external obsolescence (i.e. the effect on the value caused by intervening changes in local

did not take into account the current status and amount of several crucial items of revenue and expense in his calculations for the income method.[9] In addition, though he was well aware of the presence of asbestos on the property, he failed to adjust his conclusion for the foreseeable impact that that circumstance would have on the property's value. While Ramsland's methodology was substantially more in compliance with professional standards as to the cost approach, his evaluation is set forth in a much more summary "preliminary" written form, without adequate detail on the way in which he projected the Debtor's future cash flow and determined other component factors. Too, in calculating the value of the reversion for the income method, Ramsland failed to adjust the expected gross sales price for several foreseeable deductions.[10] Finally, while in general

Ramsland's testimony suggested a significant mastery of appraisal theory, much of what he said was quite conclusory, and his narrative was hard to follow at times.

In rebuttal testimony, however, Ramsland gave an alternate opinion that assumed a net operating income equal to Lunz's finding; adjusted it upward for the two key factors of which Lunz had not taken cognizance (anticipated savings in real estate taxes and laundry-room income); assumed a capitalization rate equal to that assumed by Lunz; adjusted the resultant capitalization of the net operating income in the anticipated year of sale for all of the deductions that Lunz had assumed; determined the resultant reversion value to be $18,713,512.00; and then calculated the present value of that sum, by using the discount rate of 13 percent assumed by Lunz.[11]

land use and the local market for similar properties) on the cost of the property in a fashion that depreciated the value of the underlying land twice for this factor. Lunz's methodology, for which he could not cite a specific source in the professional literature, was out of compliance with standards prescribed by the American Institute of Real Estate Appraisers.

9.  When he prepared his appraisal, Lunz did not have the benefit of knowing that the Debtor had just negotiated with Ramsey County to obtain a reduction in the estimated market value of the property for real estate tax purposes. This concession resulted in a considerable reduction in the tax burden on the property for the years 1989 through 1991. More crucially to the appraisal process, the benefit of the reduction in the estimated market value can be expected to go forward in the form of significantly lower real estate taxes—by some $160,000.00 to $170,000.00 per year—than those that Lunz assumed for his expense calculations. (Prudential's counsel and Lunz both insinuated that the Debtor could not count on this future savings—i.e., that Ramsey County would readjust the estimated market value to a higher level, perhaps as a result of the valuation finding made for this case. However, they produced no evidence, "hard" or even circumstantial, to back up this surmise.) Given the magnitude of the reduction in taxes, the matching increase in the property's anticipated net revenues, and the cumulative effect of the present-value analysis, this factor alone led to a marked undervaluation of the property by the income method. Second, Lunz failed to include a line-entry for the income from the building's central laundry facility, understating net revenues by some $43,000.00 per year in the early years of his projection. Ramsland pointed out these two factors in his rebuttal testimony, and incorporated them into the corrected alternate

valuation that he suggested. Beyond this, Lunz's income analysis failed to take into account two other net-revenue enhancements negotiated by the Debtor since its Chapter 11 filing, one short-term (several years' worth of major discounts on heating costs, as a result of its settlement with District Energy) and one long-term (an increase of some $20,000.00 per year in the rent from the parking garage, as a result of renegotiation of the lease to the operator). Ramsland did not factor these items into this alternative analysis either. Had he done so, the income-method valuation of the property would have been increased by another margin—perhaps small but still measurable.

10.  Ramsland did reduce the capitalized-income gross sales price by a standard 3 percent sales commission. The line-entries that he omitted were those for the tenant improvements, leasing commissions, and replacement reserves that would be attributable to a future purchaser's startup of operations in the year of purchase. As Lunz credibly testified, such a purchaser would demand a reduction of the purchase price to cover expenses for "freshening" the premises and for obtaining new tenants in its first year. It would also require "compensation" for the reserve for replacement of fixtures and equipment that the seller would be assumed to have maintained in cash on a rolling basis, but would keep after the sale was closed. This compensation would be made via an offset against the capitalized-income gross sales price, in the deemed amount of the reserves.

11.  Lunz testified that an investor in real estate in downtown St. Paul would expect a return of 12 to 13 percent, to compensate for the risks inherent in the moribund sales and rental market there.

Thus, assuming Lunz's methodology, with the noted corrections for input data, Ramsland arrived at an indicated valuation of $12,-714,664.00 for the property in an "unimpaired" state, via the income method. He then adjusted this "unimpaired" value for the presence of asbestos on the premises in accordance with his analysis of the present value of the cost of the future containment and remediation of the asbestos. This required a further reduction of value by the sum of $1,250,000.00. In this alternate conclusion, then, Ramsland opined that the value of the property was in the vicinity of $11,-464,664.00.

On the whole, the income-method valuation to which Ramsland testified in rebuttal is the result of the most comprehensive and accurate source data, the most appropriate assumptions, and a methodology most in line with professional standards. To account for the positive impact of the two income factors Ramsland did not consider, to reflect a minor correction accounting for the results by the cost approach, and to compensate for the inherent, subjective vagaries of the whole appraisal process, it is most appropriate to fix the value of the property at $11,500,000.00 for the purposes of the confirmation proceedings in this case.

### B. Result of Valuation Finding, for Prudential's Claim

As the Debtor and Prudential have stipulated, as of April 28, 1993, the Debtor was indebted to Prudential in the total sum of $10,960,862.98 in principal and accrued interest, plus attorney fees and costs of collection then undetermined. At the note rate of 8½ percent per year, interest continued to accrue in Prudential's favor at the rate of $2,197.14 per day thereafter. Even taking into consideration the accrual since April 28, 1993 of interest potentially exceeding $300,-000.00,[12] the amount of the Debtor's debt to Prudential is still below the present value of the property. With the necessary application of 11 U.S.C. § 506,[13] this has two consequences for Prudential's participation in this case. First, Prudential's claim is "fully-secured," and it has no right to have its rejecting vote tallied to any extent as that of an unsecured creditor in Class III. Second, it has a right to have its claim allowed to the full extent of the post-petition accrual of interest under the terms of the parties' original note, up to the determined value of its collateral.

## II. 11 U.S.C. § 1129(a)(2): Debtor's Compliance with Provisions of Chapter 11

As one of the prerequisites for confirmation of a plan of reorganization, 11 U.S.C.

12. This accrual certainly has been stanched, possibly even prevented, by the application of the excess of post-petition revenues over expenses pursuant to the parties' ongoing cash collateral stipulations. David Weinberger, Sentinel Management's controller, testified that the Debtor had been able to make post-petition payments to Prudential in amounts greater than those shown on its early cashflow projections, by over $100,-000.00. Apparently, this superior performance was due to enforced economies and to occupancy increases greater than those first projected. Because the Court has not been privy to the amount of revenues retained by Prudential under the terms of the stipulation, calculation of the net interest accrual, if any, and the precise, current amount of Prudential's claim, is not possible in this order.

13. In pertinent part, this statute provides:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an

unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

> (b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

> . . . . .

> (d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

>   (1) such claim was disallowed only under [11 U.S.C. §§ ] 502(b)(5) or 502(e) ... or

>   (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under [11 U.S.C. § ] 501....

§ 1129(a)(2) requires that "[t]he proponent of the plan complies with the applicable provisions of [the Bankruptcy Code]." Invoking this provision, Prudential maintains that the Debtor violated 11 U.S.C. § 1125(b) in the way it solicited District Energy to accept its plan. This issue is treated and decided adversely to Prudential in a companion order that denies its motion for designation of District Energy's ballot. Since Prudential does not complain of any other act or omission in derogation of the Code on the part of the Debtor, there is no basis for denying confirmation by applying § 1129(a)(2).

### III. 11 U.S.C. § 1129(a)(3): Good Faith

■ As a further prerequisite for confirmation, 11 U.S.C. § 1129(a)(3) requires the proponent to demonstrate that "[t]he plan has been proposed in good faith and not by any means forbidden by law." Asserting that "[t]his case is a paradigm of a single asset real estate case," Prudential urges that the presence of a complex of certain circumstances in any Chapter 11 case involving a debtor that owns a financially distressed real estate development compels a finding that the debtor lacks good faith in proposing its plan of reorganization. Prudential relies heavily on the decision of the Eleventh Circuit Court of Appeals in *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988).[14]

In addition, it cites a number of other cases that, it argues, also embody a *per se* approach to the determination of the debtor's "good faith" in a "single asset case": *In re Charfoos*, 979 F.2d 390, 393 (6th Cir.1992); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–1073 (5th Cir.1986); *Pleasant Pointe Apts. v. Kentucky Housing Corp.*, 139 B.R. 828, 832–833 (W.D.Ky.1992); *Stage I Land Co. v. United States Housing and Urban Dev. Dept.*, 71 B.R. 225, 229–230 (D.Minn. 1986); *In re Franklin Mtg. & Inv. Co., Inc.*, 143 B.R. 295, 299–300 (Bankr.D.D.C.1992); *In re Denver Inv. Co.*, 141 B.R. 228, 230 (Bankr.N.D.Fla.1992); *In re Nesenkeag, Inc.*, 131 B.R. 246, 247–248 (Bankr.D.N.H.1991); *In re Castleton Assoc. Ltd. Partnership*, 109 B.R. 347, 351 (Bankr.S.D.Ind.1989).

These cases, and others often cited toward the same end, may not really recognize a mandatory inference (or presumption) of bad faith upon the existence of a debt-and-asset structure of certain characteristics. The court in *Phoenix Piccadilly*, for instance, made much of the debtor's deliberate choice to venue the case in a judicial district far from the location of its asset and the business places of its creditors. 849 F.2d at 1395. *See also In re Mill Place Ltd. Partnership*, 94 B.R. 139, 141–142 (Bankr. D.Minn.1988).[15] In any event, *Phoenix Pic-*

---

**14.** *Phoenix Piccadilly* arose out of pre-confirmation proceedings in the Chapter 11 case of a limited partnership that owned an apartment building—the motions of several secured creditors for relief from the automatic stay of 11 U.S.C. § 362(a) and for dismissal of the case. As one of the bases for the relief they requested, the creditors maintained that the debtor had lacked good faith when it first filed for Chapter 11. (The unspoken predicate of Prudential's reliance on *Phoenix Piccadilly* is that good/bad faith in the filing of a Chapter 11 petition and good/bad faith in the proposal of a particular Chapter 11 plan are gauged by the same standard. The Debtor has not challenged this predicate and the Court assumes it, for the sake of the ruling on this issue.) In the Eleventh Circuit's view, the indicia of "bad faith" in the filing of a Chapter 11 petition can include:

1. The fact that the debtor owns only one asset, which it has encumbered.
2. A debt structure dominated by the large claims of secured creditors, and characterized by few unsecured claims.
3. A small (or non-existent) employee roll for the debtor.

4. The pre-petition pendency of a foreclosure action against the debtor's single asset, commenced because of the debtor's default in its payment obligations to the secured creditor(s).
5. The characterization of the debtor's financial difficulties as ones between it and its secured creditors, as to which resolution may be had "in the pending State Court Action."
6. Direct evidence, or an inference, that the debtor timed its Chapter 11 filing "to delay or frustrate the legitimate efforts of [its] secured creditors to enforce their rights."

849 F.2d at 1394–1395.

**15.** In "single-asset" Chapter 11 cases in this district, secured creditors often cite *Mill Place* for the proposition that such filings always must be deemed to have been in bad faith, virtually as a matter of law. This argument ignores the *Mill Place* court's heavy emphasis on two significant "badges" of subjective bad faith: the debtor's principal's pre-petition threat that the debtor would use "scorched earth" tactics through Chapter 11, if the secured creditor did not accede to an out-of-court "workout," 94 B.R. at 141; and the unfocused and non-meritorious na-

*cadilly* is not binding precedent in this Circuit. Further, though it recently had an opportunity to adopt such a *per se* approach, the Eighth Circuit did not. *See In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d 647, 650 (8th Cir.1992) (holding that Bankruptcy Court's implicit conclusion that debtor real estate partnership "did not belong in Chapter 11" because its case was "substantially a single liability case" was not an "abuse of discretion").

Under the general structure and specific language of the Bankruptcy Code, the Eighth Circuit's is the correct approach. To be sure, there is much to be said for Prudential's assertion that bankruptcy is a "collective proceeding," *In re Northwest Engineering Co.,* 863 F.2d 1313, 1315 (7th Cir.1988), which Congress created to afford a central forum for marshalling a debtor's many and varied assets and for reordering multiple competing claims against them. However, the notion that the availability of bankruptcy reorganization is limited to debtors with complicated debt-and-asset configurations is not clearly borne out by either the text of Chapter 11 or its legislative history. For many

substantive reasons, there may indeed be a poor fit between the financing structure of a distressed real estate development and the reorganization remedies afforded under the Code.[16] However, in no way does the Code prohibit such entities from trying to obtain relief from financial stress via reorganization under Chapter 11. Particularly in light of *Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991),[17] the lower federal courts should be wary of imposing a gloss on the eligibility or substantive provisions of the Bankruptcy Code to erect a bar, *per se,* on the invocation of a particular form of bankruptcy relief by a debtor of a particular sort.

On the question of a substantive standard for this issue, the Eighth Circuit has noted that

... the term "good faith" is left undefined by the [Bankruptcy] Code. In the context of a Chapter 11 reorganization, however, a plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."

---

ture of the debtor's proposed plan, 94 B.R. at 142–143.

**16.** The local caselaw of recent years is replete with examples of how such debtors have failed in their attempts to compel the restructuring of their principal mortgage lenders' claims through Chapter 11. *See, e.g., In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127, 133 (8th Cir.1993); *In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d at 650; *In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. 220, 222–224 (D.Minn. 1991); *In re Bloomington HH Investors Ltd. Partnership,* 114 B.R. 174 (D.Minn.1990); *Stage I Land Co.,* 71 B.R. at 230; *In re Mill Place Ltd. Partnership,* 94 B.R. at 143. The fortunes of the debtors in most of these cases fell because their principal secured creditors' claims were so greatly undersecured that these creditors controlled both the class consisting of their own secured claims and the class of unsecured creditors; because the debtors had no other creditors from which to form other impaired classes, they could not obtain confirmation over the opposition of the major secured parties. Most recently, *Windsor on the River Assoc.* reveals a confirmation pitfall that may limit the availability of reorganization relief for a debtor whose major mortgage lender is *over*secured: the Bankruptcy Court is not to countenance a debtor's attempt to nomi-

nally satisfy 11 U.S.C. § 1129(a)(10) by "artificially impairing" a class of unsecured trade claims. These cases all underline one aspect of the confirmation process under Chapter 11: the Bankruptcy Code requires a minimum measure of creditor consent to reorganization, in the form of a vote of acceptance by at least one reasonably defined constituency whose legal rights are defensibly and materially altered by the debtor's reorganization proposal. *In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. at 223–224. Where a debtor's debt structure is so dominated by one creditor, it may be impossible to identify such a constituency in a fashion that comports with the Code's controls over the debtor's power to classify claims under a plan. *In re Windsor on the River Assoc., Ltd.,* 7 F.3d at 132–33; *In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d at 649–650. The import of all this, however, is only that Chapter 11 may not be efficacious for *some,* and perhaps *most,* "single-asset" debtors—not that it is unavailable to *all* of them. *See In re Marion St. Partnership,* 108 B.R. 218, 223 (Bankr.D.Minn.1989); *In re Metro, Ltd.,* 108 B.R. 684, 686 (Bankr.D.Minn.1988).

**17.** In *Toibb v. Radloff,* the Supreme Court relied on the "plain language" of 11 U.S.C. § 109 to reverse the lower courts, which had held that a debtor not engaged in some form of business

*Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir.1987) (citation omitted). *See also In re Marion St. Partnership*, 108 B.R. at 223 (to determine debtor's good faith in context of motions for dismissal or conversion and for relief from stay, Bankruptcy Court should "look to the totality of the circumstances ... to determine, on an objective basis, whether there is some reasonable possibility of successful reorganization without inordinate delay ...").

■ These pronouncements fully comport with the Eighth Circuit's treatment of Chapter 13's parallel provision, 11 U.S.C. § 1325(a)(3).[18] One can fairly take a page from an early decision construing that section, where the Eighth Circuit held that, on a creditor's objection to confirmation founded on allegations of bad faith, the Bankruptcy Court must make

> ... the separate, independent determination ... [T]he proper inquiry should [analyze] whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The Bankruptcy Court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case.

*In re Estus*, 695 F.2d 311, 316 (8th Cir. 1982).[19] Under this approach, the financial goals that the debtor would accomplish through bankruptcy, and the debtor's manifested attitude toward the integrity of the bankruptcy process, are crucial factors. *In re Sitarz*, 150 B.R. 710, 721 (Bankr.D.Minn. 1993); *In re Cordes*, 147 B.R. 498, 503 (Bankr.D.Minn.1992). Admittedly, these precepts emerge from the cases of consumer-debtors with meager assets and modest debts, who seemingly have little in common with large business concerns in Chapter 11,

other than their common predicament of financial distress. However, given the identity of the statutory language, the aspects of the Chapter 13 good-faith analysis that have some factual comparability to the goals and motivations of artificial business entities and their principals are no less applicable to Chapter 11 cases.

■ The circumstances of this case do not evidence bad faith on the part of the Debtor. This result obtains whether one accepts *Phoenix Piccadilly's sub rosa* policy judgment, or makes the fairer and more neutral *Hanson* inquiry.

If one applies the *Phoenix Piccadilly* test, one has to acknowledge that the Debtor has but a "single asset," and one major secured creditor that dominates its debt structure. However, the pre-petition backdrop of this case otherwise has little in common with that in the cases that Prudential relies on; the Debtor's operating history and financial character are miles removed from those in the other decisions. The Debtor's original principals made a significant equity investment upon its formation; as a result, the Debtor made a sizeable down payment when it closed on the purchase from Kellogg Square Company, and took a real, measurable equity in the property from the inception of its ownership.[20] It has held the property for over 15 years. To all appearances, the Debtor has responsibly managed it. The building's revenues slowly ebbed for a period of several years in the late 1980s, and its apartment vacancy rate markedly increased over the same period. However, these developments were due more to the changing conditions in the local market, than to any significantly culpable failure by the Debtor to max-

---

activity was not eligible for relief under Chapter 11.

**18.** This provision, a requirement for confirmation of an individual debtor's plan of debt adjustment, requires the debtor in Chapter 13 to demonstrate that "the plan has been proposed in good faith and not by any means forbidden by law." Its language is identical to § 1129(a)(3).

**19.** The Eighth Circuit has since reaffirmed the applicability of this totality-of-circumstances analysis under § 1325(a)(3) in *In re LeMaire*, 898

F.2d 1346, 1359 (8th Cir.1990) (*en banc*) and *Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992).

**20.** As Antonio Bernardi testified, when he opened negotiations to purchase the property from Kellogg Square Company, he offered a down payment of $1,000,000.00, with the remainder of the purchase price to be financed by Prudential. After what clearly was a round of hard bargaining, the Debtor put $5,200,000.00 down, and Prudential agreed to carry the remaining $10,000,000.00.

imize cashflow.[21] In any event, since early 1991, the Debtor, through Sentinel Management, has reversed the downturn in revenues and has increased the building's occupancy by a decent margin over its historic low point.[22] Admittedly, the value of the building has declined over the term of the Debtor's ownership. However, while Prudential adduced some rather impressionistic evidence of deferred maintenance and a need for some replacement and updating, there is nothing to indicate that the Debtor has "run the property into the ground" by any extended diversion of revenues to its principals' benefit, away from major necessary repairs and improvements. The decline in value is attributable in the main to the natural aging of the building, and to the moribund downtown St. Paul real estate market. As the Debtor points out, there was, and is equity in the property; Prudential's security still protects its outstanding claim. The proposal of the Debtor's partner(s) to make another large capital infusion post-confirmation is evidence of their commitment to the property and their intent to see that the Debtor's business has the "cushion" necessary to make the plan work.

The facts, then, show anything but the sort of speculative, over-leveraged, and under-managed real estate development, run solely for the tax benefit of passive investors, that is the clear loser under the good-faith analysis of *Phoenix Piccadilly* and its progeny. Even were the "objective-factors" analysis of those decisions binding precedent for this case, then, it is not satisfied by the evidence.

Under *Hanson*, on the other hand, the proper inquiry is a deeper one. It really goes to the motivation of the debtor's principals in placing it into Chapter 11. "Good faith" is, by its nature, a subjective state of mind. However, in a Chapter 11 case, its existence or non-existence is most readily ascertained by reference to the part of the process that is supposed to reflect and embody the debtor's motives—the plan of reorganization, which is the sole ostensible reason for the debtor being in bankruptcy. Thus, as the Eighth Circuit tacitly recognized in *Hanson*, the proof of the relevant state of mind is had most readily via an "objective" piece of evidence.

Other evidence may well bear on this issue, but to a much lesser degree than the facial contents of the debtor's plan or proposal. In some of the decisions cited earlier, courts have penalized "single-asset" debtors whose principals overtly threaten to use Chapter 11 as a sword, rather than a shield, against their projects' major secured creditors. *See* cases cited *supra* at pp. 352–53, particularly *Mill Place*. Some of the language in these decisions is probably, and unfortunately, overstated. The real question is whether the debtor actually intends to use reorganization remedies for the purpose for which Congress intended, and whether it has any arguable basis in substantive law for the content of its particular proposal. Since bankruptcy reorganization is rarely sought by debtors who do not have some "live" disputes with their creditors when they file, the mere invocation of "cramdown" under 11 U.S.C. § 1129(b) against a resistant creditor is not significant evidence of bad faith. Evidence of an intent to make the bankruptcy process "prove extremely costly to" the cred-

---

21. As noted by both appraisal witnesses, a very large number of apartment units opened for occupancy in downtown St. Paul in the late 1980s, in both newly-constructed buildings and in renovated existing structures. At the same time, the rental market for office and commercial space in downtown St. Paul began to soften considerably. The latter development was due to overbuilding that occurred in the 1980s, and to the beginning of major changes in the makeup of the tenant base for the market. (The latter changes, as the appraisers testified, have continued to this day.) As a result of these developments, the Debtor's gross revenues decreased by 6.4 percent from 1987 through 1990.

22. In 1991, gross revenues rebounded by approximately 2.6 percent over their historic low in 1990. For the first four months of 1993, gross revenues exceeded the Debtor's projections by a small amount; the Debtor projected gross revenues on an annual basis for 1993 in an amount that exceeded *1990* gross revenues by approximately 14.7 percent. The apartment vacancy rate peaked at 35.74 percent in 1990. For the first four months of 1993 it averaged just short of 24 percent.

itor, on the other hand, or "to delay or injure the creditor," may be. *In re Mill Place Ltd. Partnership,* 94 B.R. at 141–142.

The Debtor admits that the main precipitants of its Chapter 11 filing were its discovery in the fall of 1990 of the presence of the asbestos, and its own inability to come to terms with Prudential over the allocation of financial responsibility for that condition. Whether the Debtor is substantively justified to affix legal liability in Prudential for the problem is not before this Court; that will be determined in due course in the District Court litigation. There is no question, however, that the Debtor sought the protection of this Court only after it tried for over a year to work out all the financial and legal issues posed by the twin factors of the asbestos problem and its own eroding financial position exclusive of that problem. Prudential did not rebut Antonio Bernardi's testimony that he had had a long and friendly relationship with it on the basis of business dealings before 1977; that he maintained positive contacts with Prudential management over the years of the Debtor's ownership; and that his own direct negotiations with personnel from Prudential's Chicago office were marked by candor, cordiality, and his own ultimate willingness to come up with a capital infusion of $800,000.00.

The workout process went on through both parties' retention of able "workout" counsel in the spring of 1992, all the way to counsel's preparation of a rather fine-tuned, comprehensive deal in the late summer of 1992. Both attorneys for the workout knew that final authority to bind Prudential to that agreement lay with "Prudential senior management" in its main office; it is clear, however, that they both worked hard to craft an arrangement that they thought their clients would find palatable.

It is also clear that both workout counsel were entirely candid, as to their plans to hedge their respective clients' bets on the workout process. The Debtor's counsel early made Prudential's counsel aware of his client's option to file for Chapter 11, and its intent to do so if things came to that. In turn, the Debtor's counsel was equally aware of the limits on Prudential's counsel's negotiating authority. He also was given fair advance notice that Prudential was commencing proceedings for the appointment of a receiver in the Minnesota state courts, concurrently with the final stages of the workout negotiations, so Prudential could go to law if the parties could not come to terms.

When Prudential's senior management balked at the terms of the attorneys' workout agreement, it was poised to proceed with its state-law remedy to unseat the Debtor from possession. The Debtor then sought its federal-law remedy here. Both sides now make veiled insinuations of duplicity on the part of their opponents. However, the events bespeak nothing more than hard, close bargaining that failed, and a comprehensive, if somewhat hard-nosed and hard-headed, sense of strategy on the part of everyone concerned. Prudential certainly cannot complain credibly of being blindsided by the Chapter 11 filing. The circumstances under which the Debtor went into Chapter 11, then, do not manifest bad faith on the Debtor's part.

To a like conclusion, Prudential cannot complain of any failure by the Debtor to thoughtfully and carefully craft a reorganization proposal in accordance with the known legal precedent that would have governed its confirmation at the time. To be sure, it is a bit untoward that the plan does not put all of the parties' disputes at an end, and will leave the Debtor and its major secured creditor in ongoing, complex litigation. The Debtor, however, did offer two options to Prudential—one proposing to discount the present value of Prudential's secured claim to account for the Debtor's estimation of the negative impact of the asbestos problem on the property's value, and the other proposing to reserve that estimation for evaluation and decision in another forum, and in a different legal context. While Prudential did not find the former alternative palatable, it cannot deny several things. First, it was afforded a choice between separating its twin roles as creditor and defendant, at one sort of cost, and accepting a global resolution of all disputes arising from both roles, at another. The mere act of affording such a choice is a measurable accommodation by the Debtor. Second, both proposals clearly had a theory of fact and law behind them, which took into

consideration the costs of maintaining the litigation versus the costs of the Debtors' independent containment and remediation of the asbestos problem.[23] Third, Bernardi credibly asserted—without controversion from Prudential—that he and his family just wanted to obtain some way to retain and responsibly manage the property, and to account to Prudential in its role as a creditor and mortgagee, while retaining some viable option to cope with the genuine effect that the presence of asbestos had had on the marketability of the building.[24]

As evidenced by the closeness of the issues treated in this order, the plan that was prompted by that desire had a reasonable chance of achieving a result consistent with § 1129. While the terms that are now before the Court via Prudential's election are the product of partisanship, they certainly do not reflect any intent on the part of the Debtor's principals to subvert the reorganization remedy from its statutory requirements, in a fashion inimical to the interests of Prudential that are recognized and protected under that statute. The fact that the plan as proposed is not confirmable due to two defects does not change this result. To evidence the Debtor's good faith, *Hanson* only requires a "reasonable likelihood" of meeting confirmation requirements—not a certainty.[25]

Simply stated, the parties may not like each other very much at this point, and thus far they have been unable to consensually resolve the disputes arising from their dual roles in the acquisition and retention of the property. However, nothing in the history of this case, and nothing in the face of the Debtor's reorganization proposal, shows that the Debtor lacks good faith in being here as it is. There is no basis for denying confirmation under § 1129(a)(3).

## IV. 11 U.S.C. § 1129(a)(7)(A): Best Interests of Creditors

11 U.S.C. § 1129(a)(7)(A) requires that,
[w]ith respect to each impaired class of claims or interests—
(A) each holder for a claim or interest of such class—
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under [C]hapter 7 of [the Bankruptcy Code] on such date . . .

Prudential, of course, has rejected the Debtor's plan. Under the rubric of this provision, it maintains that it will not receive "value, as of the effective date of the plan," that is at least equal to what it would receive on account of its secured claim, were the Debtor to go through liquidation under Chapter 7. The thought behind this objection seems to be that, were the Debtor in Chapter 7 as of the effective date, Prudential could proceed with a foreclosure of its mortgage, ultimately take title to the property, sell it, and reinvest the proceeds in the financial markets at a rate of return materially higher than what the Debtor proposes to pay Prudential under the plan. Prudential's only point of contention under this theory is the rate of interest that the debtor is to pay to Prudential under the plan.

There is little reported caselaw on the question of what § 1129(a)(7) means, as to a secured creditor and its claim. To the extent that they even compare the effect of the two provisions, the few reported decisions suggest that they operate to the same end— payment of the "present value" of the secured claim. *E.g.*, *In re Eisenbarth*, 77 B.R. 228, 234 (Bankr.D.N.D.1987). As to

23. The soundness of the financial underpinnings of the plan is borne out by the fact that Prudential has not objected to confirmation on the ground that the plan is not feasible.

24. Bernardi testified that, after he learned of the presence of the asbestos in the fall of 1990, he found that prospective buyers were asking more and more frequently about the issue—and that, upon learning about it, their interest in a pur-

chase quickly faded. Prudential offered no evidence to controvert his statements.

25. To hold to the contrary would impose a rather foolish tautology on § 1129: no plan as to which confirmation was denied, no matter on what novel issue, could ever be found to have been proposed in good faith.

§ 1129(a)(7), they generally hold that "[t]he appropriate rate of interest for calculating the present value of a claim is the *current market rate* for a loan under similar circumstances." *In re Landscape Associates, Inc.,* 81 B.R. 485, 487–488 (Bankr.E.D.Ark.1987). *See also In re Eisenbarth,* 77 B.R. at 234–235; *cf. In re Victory Constr. Co., Inc.,* 42 B.R. 145, 151 (Bankr.C.D.Cal.1984) (generally considering current market rate but holding that it is not mandatory if it exceeds contract rate).

■ Probably following the lead of these decisions, Prudential frames the predicate assumptions for this theory in a fashion identical to the way it has for its objection under the "cramdown" provisions of § 1129(b)(2)(B): the rate of interest that a Chapter 11 Debtor offers on account of a secured claim should correspond to the current rate available in the financial markets, to compensate the secured creditor for the continuing risk it will have to bear under the Debtor's plan. This position somewhat confuses the differing considerations underlying the two statutes. Section 1129(a)(7) is designed to ensure that, in a more general way, creditors (both secured and unsecured) are no worse off under a plan of reorganization than they would be with the Debtor in Chapter 7. On the other hand, § 1129(b)(2)(A) is designed to fine-tune a Debtor's treatment of a dissenting secured creditor's claim, to maximize the likelihood that the creditor will recover the amount of its full secured claim over time.

■ From a common-sense perspective, there is much to be said for Prudential's general position: as a secured creditor in a Chapter 7 case, all it would do is "cut and run" with its collateral; as a result, the "floor" that § 1129(a)(7) sets for the value of its right to payment should be driven by the return it could obtain in the market, from a value that is equal in amount to its investment in the Debtor.[26] This issue, however, is one of fact. If the Debtor meets its initial burden by producing evidence that its prof-fered interest rate is defensible, the burden shifts to the objecting creditor. The creditor then must show that, if it reinvested the proceeds of its repossessed collateral in accordance with its own policies, needs, and expectations, it could obtain a specific return, and one that is greater than the debtor offers.

■ Prudential strongly objects to the Debtor's proffer, on the general ground that it is below the current rates charged on mortgage loans for real estate developments of similar characteristics. The Debtor's evidence to support its proffered interest rate, while not entirely on point to the requirements of the statute, is still enough to meet the initial burden of a plan proponent under § 1129(a)(7). The burden of production then shifted over to Prudential. The evidence necessary to meet that shifted burden had to go to a series of predicate facts: Prudential's current institutional goals for investment income; the type(s) of investment into which it would put the sale proceeds after realizing them; its likely election, if it would consider more than one type of investment; and the rate of return anticipated to be available from the contemplated type(s) of investment as of the date on which Prudential expected to realize the sale proceeds. Prudential introduced no evidence going to any of these points, choosing instead to perfunctorily equate the current availability of a certain rate for the very same type of investment as its loan to the Debtor, with what it could or would get with the value it would recoup, months or years in the future, were the Debtor now put into Chapter 7. This is not sufficient to meet the creditor's burden under this theory of objection. As a result, there is no basis for denying confirmation under § 1129(a)(7).

## V. 11 U.S.C. § 1129(a)(10): Acceptance by at Least One Class of Impaired Claims.

11 U.S.C. § 1129(a)(10) requires the proponent of a plan to show that,

**26.** Decisions like *Eisenbarth* reach the same conclusion as to the applicability of market conditions, but from the wrong process: by noting the virtual identity of the language of § 1129(a)(7) and § 1129(b)(2)(A), and then engrafting the reasoning of decisions construing the latter provision. 77 B.R. at 234–235.

[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

In definition of the concept of acceptance, 11 U.S.C. § 1126(c) provides:

A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under [11 U.S.C. § 1126(e)], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under [11 U.S.C. § 1126(e)], that have accepted or rejected such plan.

Prudential's objection to confirmation that sounds under these provisions concerns Class III, the class of unsecured creditors, which is the only class of impaired claims through which the Debtor could satisfy § 1129(a)(10). In its written objection and in six accompanying motions, Prudential raised multiple issues going to the question of whether the vote by the members of this class satisfied these sections. Through a stipulation filed on May 14, 1993, the Debtor and Prudential settled the issues raised by three of the companion motions.[27] In two orders accompanying this one, the Court has decided the issues raised by three other motions,[28] within the contemplation of Terms 16 and 17 of the stipulation. As a result of the stipulation and the rulings, the final tally of Class III claimants is 40 votes accepting, representing claims in a total of $97,743.03, and 9 votes rejecting, representing claims in a total of $8,599.29. These results are sufficient to constitute an acceptance by Class III, within the contemplation of § 1126(c).[29]

In the alternative, Prudential maintains that even under such a tally result the Debtor has not satisfied § 1129(a)(10), because Class III is not truly a class of "impaired" claims. Prudential bases this argument on its assertion that, on the effective date of the plan, the Debtor will actually have the means to pay off all Class III claims in full, from the capital infusion that its partners are to make. Thus, Prudential argues, even though the plan technically impairs Class III claims,[30] this impairment is an "artificial" one that should not be given cognizance under § 1129(a)(10).

As a general proposition, the Eighth Circuit has cautioned the Bankruptcy Court to

---

**27.** These motions were the one to designate the votes of certain Class III claimants to the extent that the amount of claim asserted on the face of their ballots exceeded the allowed amount of their claims; the one to designate Sentinel Management as an insider; and the one to designate the ballots of certain Class III claimants on the ground that employees of the Debtor had prevailed on them to renege on their alleged agreement to allow Prudential to purchase their claims for the purpose of voting them. The stipulation also resolves the status of three other votes that Prudential had challenged in its objection to confirmation.

**28.** These motions were the one for designation of District Energy's ballot; and two motions for leave to change certain previously-cast ballots from acceptances to rejections.

**29.** The outcome of Prudential's motions for designation of District Energy's ballot and for leave to change the votes under certain other ballots was pivotal to this conclusion. If the outcome of those motions had been adverse to the Debtor, the vote would have been tipped to a 27–21, $26,945.72-to-$22,182.80 outcome. Though the former outcome would have met the numerically requirement, the latter would not have met the amount-of-voted-claims requirement. This would have prevented the Debtor from satisfying 11 U.S.C. § 1129(a)(10) and, in turn, would have mandated denial of confirmation at a threshold stage. The parties fully acknowledged all of this via Term 17 of their stipulation. (They and their counsel deserve a round of thanks for saving the Court the burden of making the tallies under the several permutations of assumptions.)

**30.** In pertinent part, 11 U.S.C. § 1124 provides that, subject to an exception not relevant here,

... a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

. . . . .

(3) provides that, on the effective date of the plan, the holder of such claim ... receives, on account of such claim ... cash equal to—
(A) with respect to a claim, the allowed amount of such claim ...

Under this illustrative definition, any proposal to pay unsecured claims on any basis other than in full, in cash, and on the effective date, impairs those claims.

beware of "thinly veiled attempt[s] to manipulate the vote to assure acceptance of ... plan[s] by an impaired class and meet the requirements of 11 U.S.C. § 1129(a)(10)." *In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d at 650.

> Classifications designed to manipulate class voting must be carefully scrutinized. There is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one call of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions.

*Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d at 1313. *See also In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. at 222–223.

Until very recently, these concerns were invariably voiced in cases where reorganizing debtors proposed to classify the unsecured portion of a major undersecured creditor's claim separately from unsecured trade creditors' claims, in the hopes that an acceptance by the class of trade creditors would satisfy § 1129(a)(10) despite the anticipated rejection by the undersecured creditor in both of its statuses. *E.g., In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d at 648–649; *In re Mill Place Ltd. Partnership,* 94 B.R. at 142–143. This has been termed the problem of "artificial classification"—a debtor's strategy effectuated in the act of describing a class for the purpose of drafting a plan. *In re Windsor on the River Assoc., Ltd.,* 7 F.3d at 131.

Recently, however, the Eighth Circuit recognized a related phenomenon that "has arisen most commonly in single-asset reorganization," the "problem of artificial impairment" of claims in a class. *Id.* In identifying this problem, the Eighth Circuit was prompted by the same concerns that motivated the courts treating the issue of "artificial classifi-

cation": the prospect that debtors could use the all-powerful equitable remedies in Chapter 11 to rewrite their pre-petition bargain with the creditors that dominate their debt structures, without having the statutorily-required minimum degree of meaningful consent by another constituency to the case. *In re Windsor on the River Assoc., Ltd.,* 7 F.3d at 131. Following this logic, a number of courts have held that debtors do not satisfy § 1129(a)(10) where they rely on the crafting of an "artificial impairment" of a class of unsecured trade creditors to create an accepting class. The "artificial impairment" most commonly found in such cases is the proposal to reamortize unsecured claims, or a small secured claim, for payment in full over a fairly short period of time, when the reorganized debtor would have the means to pay the claim(s) in full as of the effective date of the plan. *In re Windsor on the River Assoc., Ltd.,* 7 F.3d at 130–31; *In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. at 223–224; *In re Miami Center Assoc., Ltd.,* 144 B.R. 937, 943 (Bankr.S.D.Fla.1992); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 427 (Bankr.W.D.Tex.1988). *See also In re Club Assoc.,* 107 B.R. 385, 401 (Bankr.N.D.Ga. 1989). As a general proposition, the Eighth Circuit held in *Windsor* that,

> for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question *arises solely from the debtor's exercise of discretion.*

7 F.3d at 132 (emphasis added).

*Windsor* is the first treatment of this issue by a Circuit Court of Appeals, and on its face it is a relatively comprehensive one. The similarity of its facts to those at bar [31] *may* make it utterly determinative of the Debtor's fortunes. Unfortunately, because *Windsor* was decided after counsel finally submitted the issues here,[32] they and their clients did

---

**31.** The partnership-debtor in *Windsor* owned a 298–unit apartment development. Its debt structure was dominated by one lender-mortgagee, the amount of whose claim comprised 99 percent of the total of allowed claims in the case. The lender's claim was oversecured. In its plan, the debtor proposed to have its partners make a $1,000,000.00 capital infusion, part of which was to be used to pay down the lender's claim to a specific balance and the rest of which was to be

used for operating capital. The small number and amount of claims in the class of unsecured creditors were to be paid in full in cash from post-confirmation revenues, 60 days after the effective date of the plan.

**32.** In fact, when the decision in *Windsor* was issued, the undersigned had almost finished work on the original version of the present order.

not have the benefit of it in presenting their respective positions.

This is especially serious because, as the Eighth Circuit noted, the central issue is one of fact. *In re Windsor on the River Assoc., Ltd.,* 7 F.3d at 132. *See also In re Sun Country Development, Inc.,* 764 F.2d 406, 408–409 (5th Cir.1985). As the Debtor pointed out even before *Windsor,* the inquiry was not as perfunctory as just gauging the length of a proposed reamortization, and turning down one that seemed too short. Other courts have passed on plans that impair the rights of holders of trade claims via short-term reamortizations and have concluded that they do not offend § 1129(a), as long as the appropriate facts are present. Although these cases are usually decided under the rubric of § .1129(a)(3), their rationale is as applicable to the issue framed under § 1129(a)(10): where a Debtor elects to pay off a relatively small class of trade claims from post-confirmation revenues, even over a relatively short period, it does not unfairly manipulate either the concept of impairment or the classification process—if, in fact it lacks any other means to pay them because its pre-confirmation revenues and post-confirmation resources are properly committed to current costs of operation and to other purposes under its plan. *In re Sun Country Development, Inc.,* 764 F.2d at 408; *In re Mortgage Investment Co. of El Paso,* 111 B.R. 604, 611–612 (Bankr.W.D.Tex.1990); *In re Consolidated Operating Partners L.P.,* 91 B.R. 113, 115 (Bankr.D.Colo.1988).

When they found in favor of the debtor on this issue, these courts did not second-guess the debtor in its allocation of post-confirmation resources. In a very explicit fashion, *Windsor* pierces this approach, and layers on another challenge to debtors in this situation; in identifying the issue as whether the debtor's financial means actually give it the discretion to impair the claims in a class or to leave them unimpaired, the Eighth Circuit perforce directed a searching examination into the financial defensibility of the impairment. In this inquiry, it is clear, the Bankruptcy Court is to give virtually no deference to the debtor's rationale. 7 F.3d at 132–133.

On the present record, it just is not possible to determine whether the Debtor's proposed impairment of Class III claims is a calculated facade to lever Prudential into the position of having to defend a cramdown of its secured claim under § 1129(b). The record would suffice under the state of governing precedent before *Windsor;* clearly, because all net post-petition revenues were applied to operating expenses, real estate tax escrows, and interest payments to Prudential, the Debtor itself would have had no cash on hand from which to pay trade claims, and the election of the Debtor and its partner(s) to allocate the capital infusion as they did under the plan would not have been subject to reproach.

Now, however, many new questions, most of fact but some of law, have arisen: What is the current amount of Prudential's claim, unpaid post-petition interest included? What, then, must be paid to Prudential to reduce its secured claim to the amount specified under the plan? What is the likely total amount of allowed unsecured claims? How much by way of real estate taxes will the Debtor have to pay on the effective date? If it becomes necessary, would the partner(s) pay additional monies into the Debtor to meet all obligations of payment due on the effective date? How much of an operating reserve does the Debtor intend to establish from the capital infusion; to what purposes may those funds be put, what is the likelihood that they will be so used, for how long will the reserve really be maintained if it is not exhausted, and what use will be made of the funds if the need for the reserve is deemed to end? What are the answers to the same questions, as to the reserve for the costs of the litigation against Prudential? Do the rather unique circumstances of this case, and the nature of the allegations in the litigation, except the establishment and maintenance of the reserve funds from the probing inquiry under *Windsor?* Does the Debtor's unrebutted proof that it cannot presently obtain refinancing on the open market due to the presence of asbestos, and the role it alleges Prudential had in its asbestos problem, except its allocation of the capital infusion from that inquiry?

With the recent arrival of *Windsor*, these issues are all novel, and portentous. The status of this case is just not ripe for their adjudication. Accordingly, since Prudential has made two other sustained objections to confirmation, disposition of its objection under § 1129(a)(10) must be deferred to the proceedings on confirmation of any successor plan that the Debtor may submit.

## VI. 11 U.S.C. §§ 1129(a)(8) and 1129(b)(2)(A): "Cramdown" of Plan, Over Prudential's Objection

■ 11 U.S.C. § 1129(a)(8) requires that, [w]ith respect to each class .of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan ...

Rejection by a class of impaired claims, however, does not mean that a plan cannot be confirmed. By its so-called "cramdown" provisions, the Code gives plan proponents the possibility of obtaining confirmation over such a rejection. As to Prudential, the Debtor invokes the one in 11 U.S.C. §§ 1129(b)(1) and 1129(b)(2)(A)(i):

(b)(1) ... if all of the applicable requirements of [11 U.S.C. § 1129(a)] other than [11 U.S.C. § 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or trans-

ferred to another entity, to the extent of the allowed amount of such claims;

(i)(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; [or]

. . . . .

(iii) for the realization by such holders of the indubitable equivalent of such claims.

As applied to Prudential, § 1129(b)(2)(A) requires it retain its lien against its pre-petition collateral, and that it receive cash payments in the future, in a total equating to the present value of its fully-secured claim. *In re Bergh*, 141 B.R. at 420–421.

Prudential's objection to confirmation raises three different issues as to the Debtor's "cramdown" proposal. Two go to the "present value" requirement of § 1129(b)(2)(A)(i)(II), and the other goes to the requirement that a proposed treatment by cramdown be "fair and equitable." As noted earlier, the Debtor proposes to pay Prudential's claim down to a balance of $10,500,000.00 on the effective date; to pay that balance with interest at a flat annual rate of 8.5 percent, via monthly payments under a 30–year amortization, with a "balloon" due in 20 years; and to furnish security for this debt by preserving the configuration of collateral rights that the Debtor granted to Prudential in 1977. Prudential takes exception to every material aspect of the proposal.

### A. Interest Rate as an Aspect of Present Value

Prudential's first objection to the Debtor's "cramdown" proposal is based on one of the rights that § 1129(b)(2)(A)(i)(II) gives it, in the event of such a cramdown: to receive "deferred cash payments ... of a value, as of the effective date of the plan, of at least the value of [its] interest in the [debtor's] interest in" the property.[33] In financial terms,

---

**33.** The use of the value of the creditor's secured interest as the criterion for measuring the credi-

tor's payment rights, of course, dovetails with the conceptual underpinning of 11 U.S.C. § 506(a):

the issue translates to whether the Debtor proposes to pay Prudential an appropriate rate of interest [34] on the outstanding principal balance of its claim, over the period the debt is to be amortized. *In re Monnier Bros.*, 755 F.2d 1336, 1338 (8th Cir.1985). This issue is one of fact, *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir.1989), which is to be determined on the circumstances of each case, *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1289 (8th Cir.1986).

▪▪▪▪ In general, however, the binding Eighth Circuit precedent requires the proponent of the plan to identify a rate of interest that could be earned on a risk-free investment, such as that currently paid on a United States treasury bond of like term, and then to augment that rate by an increment that is sufficient to compensate the secured creditor for the risk it will bear over the term of the reamortization, as a result of the reorganized debtor's retention of the possession of the collateral. *United States v. Doud*, 869 F.2d at 1146; *In re Monnier Bros.*, 755 F.2d at 1339. *See also In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990) (recognizing *Doud* as applying just this methodology).

In the second step of this process,

> [t]he appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

the value of a creditor's secured claim is coequal to the extent it attaches to value in the underlying collateral.

**34.** Consistent with financial terminology, the cases refer to both "interest rate" and "discount rate" in identifying the central concept here: the time value of money.

**35.** This conclusion is amply supported as to *Fisher*, by at least two circumstances: *Fisher* is the only one out of the four extant Eighth Circuit decisions to even suggest a direct reference to current interest rates charged in the market for comparable loans; and the suggestion in *Fisher* seems to have been made as a counterpoint to

*In re Monnier Bros.*, 755 F.2d at 1339 (quoting 5 COLLIER ON BANKR. ¶ 1129.03, at 1129–65 (15th ed. 1984)). The current rate charged in the local lending market for loans of comparable terms may be relevant to the fixing of the ultimate interest rate. *In re Fisher*, 930 F.2d 1361, 1364 (8th Cir.1991). So might the rate actually charged in the parties' pre-petition contract, as long as it was set on a date not too remote in time or market conditions from the date on which the plan is before the Bankruptcy Court for confirmation. *In re Monnier Bros.*, 755 F.2d at 1339 (concluding that, *at least in the absence of countering evidence*, contract rate fixed "some twenty months" before the date of plan confirmation "presumably reflected the prevailing cost of money, ... the prospects for appreciation or depreciation of the value of the security, and the risks inherent in [the term and nature of the] loan ...").  However, under the tenor of the Eighth Circuit cases, consideration of these alternative factors must not supplant the basic mode of calculation required under *Monnier Bros.*[35]

On this issue, both sides presented the testimony of mortgage bankers; Farnham Nichols testified on behalf of the Debtor, and David Mott and Stanley Johannes testified on behalf of Prudential. While Nichols's testimony was illuminating to some degree, it was not as directly probative as that of Prudential's two experts. The bulk of Nichols's recent experience in generating mortgage financing lay in the area of government-insured loans for multi-family residential housing; he had little to offer on the identification of the added cost of risk, as it would impact on financing that was not government-insured.[36]

the proposal of the defaulting farmer-debtors in that case, under which they would have retained the significant benefit of below-market pre-petition interest rates under a special federal program, despite their default in payment. Most tellingly, the *Fisher* court cited *Doud* at length; *Doud*, in turn, relied heavily on *Monnier Bros.*; and *Fisher* did not overrule or modify *Doud* and *Monnier Bros.* in favor of adopting a standard in which the discount rate must be fixed by prevailing market rates.

**36.** Nichols testified, in so many words, that his "staff ha[d] talked briefly with the Department of Housing and Urban Development, and indications [were] that they [would] look at it"—i.e. at

Of the two Prudential witnesses, Johannes was by far the more sanguinary as to the prospect for obtaining a loan whose terms included any of those proposed by the Debtor. Both Prudential witnesses testified that, by the current standards of lenders in the multi-family housing finance markets, the Debtor's proposal provided for an amortization and loan term that were too long, a loan-to-value ratio that was too high, and an interest rate that was too low. Johannes opined that he would not be able to arrange a financing package with all of the Debtor's terms. He did, however, candidly acknowledge several points that were in the Debtor's favor in whole or in part: in general, the current market for major real estate financing is becoming somewhat more favorable to borrowers, and lenders are more willing to take on a degree of risk than they were a year or two ago; some lenders might consent to a 30-year amortization for a loan of this size, with a term of 20 to 25 years; and the risk factor arising from the age, condition, and occupancy level of the Debtor's building would probably require an interest rate of 250 basis points (i.e., 2.5 percent) over the current interest rate paid on a Treasury security of like term. In his opinion, however, the maximum loan-to-value ratio that would be acceptable to a prospective lender in the conventional financing markets was 75 percent—i.e., the prospective borrower would have to demonstrate significant equity in the collateral, to the extent of 25 percent of its current value.

For its objection on this issue, Prudential has pointed to specified details of the identified characteristics of the Debtor's proposal that Mott and Johannes believe would prevent the placement of a loan. However, the subtle implication looming over Prudential's argument is that there is *no* interest rate that could provide it with the present value contemplated by the statute, because the loan-to-value ratio proposed by the Debtor exceeds 95 percent. Incontrovertible as its predicate fact is, however, it does not doom all interest-rate proposals that the Debtor could make.

■■ The reason is simple: contrary to the basic premise of Prudential's argument, the rule in the Eighth Circuit does not set up the availability of identically-termed financing in the current relevant market as the controlling determinant of present value under § 1129(b)(2)(A)(i)(II). Under *Monnier Bros.* and *Doud,* the Bankruptcy Court is to gauge the quality of the specific security proffered by the reorganizing debtor, in weighing the adequacy of its proposed interest rate. The determination as to the security is a case-specific one; it clearly is to be made independent of the generalized presumptions on the worthiness of broad types of security that underlay the guidelines that lenders currently impose on applications for similar financing. At the moment, to be sure, the market demands a far larger incoming equity position on the part of applicants for financing for real estate developments, than it did during the 1980s. Mott and Johannes both suggested that this is a latter-day response to the widespread failure of over-leveraged, speculative real estate developments in most areas of the country in recent years. However, under *Monnier Bros.* the real consideration is *whether the value of the creditor's investment will be sustained under the debtor's proposal. Monnier Bros.* and *Doud* contemplate that this is to be accomplished by the two vehicles: preserving the pecuniary value of the collateral security, consistent with general standards for responsible use and upkeep; and maintaining the parity of the subject loan in the creditor's investment portfolio, by adjusting the pre-bankruptcy interest rate to account for any measurable decrease in the likelihood that the creditor will recover the full principal of its secured investment and a reasonable rate of return on it.

■ A demand for a sizeable investor equity in a financed project is not the only means by which a lender reaches a level of comfort about a prospective loan. Lenders also rely on such things as their past experience with the borrower or the borrower's

---

extending insurance for financing for the Debtor's property. This was all he said. It certainly did not establish that the Debtor and the proper-

ty were qualified to receive the very special sort of loan that would bear the specific interest rates to which he testified.

affiliates; the likelihood that the collateral will maintain, or increase in, market value; and the borrower's foreseeable ability to timely service the debt from future revenues.[37] Under *Monnier Bros.* and *Doud,* the Bankruptcy Court may evaluate and rely on these factors in gauging the appropriateness of a discount rate proffered by a debtor. It is allowed to approve a debtor's proposal that does not conform to every last requirement of the current market, so long as the debtor's proposal meets the statutory requirement of maintaining value.

Ultimately, the existence of incoming borrower equity goes to two different relevant considerations: whether debt service will be at a level that can be met from the revenues from the property, and whether the borrower will have any motivation to retain and aggressively manage the property if it experiences a downturn in revenues and an impending default on its obligations. Certainly, the former consideration is important in the reorganization context—both for protecting the secured creditor's property interests and for safeguarding the integrity of the Chapter 11 process generally. However, if a debtor meets the general feasibility requirement of 11 U.S.C. § 1129(a)(11) [38] with credible cashflow projections, regardless of the extent of its equity position in the collateral, current market standards dictating a larger equity for a new loan are irrelevant. The latter consideration can be satisfied by reference to other factors: the debtor's past history with the project and with the lender; its subjective commitment to retain the property and the affiliated business from it; the amount of any cash infusion which the debtor or its principals will make during the consummation of the plan; whether that cash infusion is to be applied in any part to reduce the secured creditor's claim; and whether the debtor has any broader "business plan" for the property, under which it would deal with problems that have nothing to do with the nature, amount, and terms of its debts.

█ In this case, there are so many other indicia for the preservation of the value of Prudential's investment, that the Debtor can meet § 1129(b)(2)(A)(i)(II) without meeting the current market's requirement for a more significant loan-to-value ratio. The Bernardi family interests have a strong personal commitment to the continuing success of this building, and have every motivation to recover its own long-time investment in it. They are putting a considerable amount of money at further risk by the capital infusion into the reorganized Debtor, the greater part of which will inure immediately to Prudential's benefit. By all appearances, the Debtor's relationship with Prudential was a stable, positive one; it lasted for over a decade, and did not end until the discovery of the asbestos. Throughout the workout negotiations, Antonio Bernardi dealt in good faith with Prudential; he does not deny the Debtor's duty to repay what it borrowed. The Debtor backs its plan with strong cashflow projections, consistently based on conservative assumptions, as to income and expenses. The projections show that the Debtor will be able to make all payments required under the plan; they contain enough of a revenue "cushion" that the Debtor should be able to meet unforeseen contingencies. The projections include reasonably-sized reserves for repairs, long-term maintenance needs, and replacement of the appliances and fixtures in the apartment units.[39] One of the most telling points as to "the risk of subsequent default" is the fact that Prudential did not even present countering cashflow projections, and does not object to confirmation on feasibility grounds.

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

---

**37.** Judging by the structure of the many loan transactions that have gone into default in recent years, all through the 1980s the lending industry reposed much more trust in the latter two factors, and much less on developers' and owners' past creditworthiness and present stakes in their projects.

**38.** In pertinent part, this provision requires the proponent of a plan to demonstrate

**39.** Many of the latter, the Debtor admits, are nearing the end of their useful life.

The building on the property is of sound construction and is in relatively good shape, as conceded even by Lunz.[40] Nichols testified that the building has been "a flagship over the years" in the local market, as to its prominence and the quality of its management. As Lunz acknowledged in his written report, the building has an anticipated useful life of at least another 50 years.

All of these factors—physical, financial, and personal—fully support a conclusion in favor of the Debtor as to the basic quality of the proffered security and the low likelihood of future default. The Debtor's proposals for interest rate and amortization, then, should be considered on their merits without the automatic veto of applying the current market's loan-to-value standards.

On that issue, the exhibits in evidence establish that the yield on 20–year Treasury bonds over the month-long span of the several sessions of the confirmation hearing ranged from 6.5 percent to 6.72 percent.[41] The rate as of the date of this order is in the range of 5.8 percent[42]. While none of the witnesses on this issue gave their opinion on a specific interest enhancement within the contemplation of the Eighth Circuit cases, the facts at bar support the conclusion that an enhancement of 300 basis points, or 3 percent, is most appropriate.[43] Under *Monnier Bros.* and *Doud,* then, the Debtor should be proposing a discount rate of 9.5 percent.

Of course, this exceeds the rate set in the plan, by a material degree. As to the aspect of the discount rate to be applied, then, the Debtor's plan does not afford Prudential the present value of its claim. Prudential's objection to confirmation must be sustained in this regard.

### 2. Proposed Duration of Debt Service as an Aspect of Present Value.

Prudential's second objection to the Debtor's cramdown proposal also sounds under § 1129(b)(2)(A)(i)(II), but in a more general sense. Prudential argues that the proposal will not provide it with true "present value" because the Debtor proposes to reamortize its debt over a term that is "simply too long." Noting that the term of the original loan would end in just another five years, Prudential essentially argues that the proposed reamortization would frustrate its expectations under the 1977 transaction in a fashion inconsistent with "fairness" and "equity." Asserting that the Debtor's proposal lacks "commercial reasonableness," a quality that it maintains is inherent in the statutory test for a cramdown, Prudential's counsel cites *In re Miami Center Assoc. Ltd.,* 144 B.R. 937 (Bankr.S.D.Fla.1992) and *In re VIP Motor Lodge, Inc.,* 133 B.R. 41 (Bankr.D.Del.1991). In both of these decisions, the courts applied a standard that would gauge the generalized "fairness" and "equity" of a debtor's reamortization proposal by the terms currently available in the marketplace for financing for

40. While Lunz opined that the building was "tired," lacked "curb appeal," and needed some modernization and "brightening" via the replacement of worn out interior decor, he admitted that the building's amenities were "good," and described its overall condition as "fair to average."

41. The parties tacitly agreed that this rate was an appropriate benchmark for a "risk-free" investment.

42. Pursuant to FED.R.EVID. 201, judicial notice has been taken of the rate published in the October 22, 1993 issue of the *Wall Street Journal.*

43. As Johannes testified, the conventional-financing market for multi-family housing currently applies interest enhancements of 200 to 385 basis points over the Treasury security rate. He opined that, for this property, an enhancement in the range of 250 to 385 basis points would be appropriate, with the age of the property putting it "toward the upper end." His search revealed that the most borrower-favorable combination of terms that he could find included an interest adjustment of 250 basis points, with a 75 percent loan-to-value ratio and an amortization of 25 years, with a 20–year term. For the reasons noted earlier, the loan-to-value ratio need not factor into the interest enhancement, as its predicate goal is satisfied by other circumstances. Under Johannes's methodology, an increase of the interest enhancement by 50 basis points would seem to be the best compensation for the Debtor's proposal to increase the amortization by another five years. Since the 20–year balloon would remain the same, this component enhancement is sufficient to cover the risk caused by a somewhat smaller reduction in principal before the due date of the loan.

a project of similar characteristics. 144 B.R. at 941; 133 B.R. at 45.

■ The Eighth Circuit addressed a similar contention in *Monnier Bros.*,[44] and stated that it was "not persuaded by this argument." Observing that "[t]he cram down provisions contemplate deferred pre-payment of secured loans," 755 F.2d at 1342, the *Monnier Bros.* court went on to conclude that the debtor's proposal to reamortize a large secured loan neither was inherently unfair or inequitable to the objecting creditor, nor embodied any treatment that unfairly discriminated against that creditor in favor of other constituencies to the case. Treating the issue as one of fact (as it had the issue of the discount rate), the *Monnier Bros.* court observed that the objecting creditor would retain its lien under the plan, that its collateral (farmland) was not subject to rapid depreciation, and that the original loan provided for a term of equal duration.[45]

Under the rule in this circuit, then, Prudential's original expectations—no matter how long-seated—do not control the outcome on this issue. Neither do the prevailing market terms that would be imposed, were the Debtor's proposal presented now as an original loan application. The basic inquiry is one of fact, and it is the same as that for the interest-rate aspect of the present value analysis: whether the extension of the time over which Prudential will recover its principal unfairly imposes excessive risk on it.

It does not, for most of the same reasons that defeat Prudential's insistence on a higher loan-to-value ratio. As Johannes acknowledged, the commercial mortgage market would not reject a 20–year term for a mortgage loan on this property out of hand.[46] As Lunz testified, the building has an anticipated useful life that significantly exceeds the proposed term. Finally, as Ramsland's testimony bore out, the balance of the debt at the end of the term of the loan, approximately $6,500,000.00, is not significantly greater than the anticipated value of the reversion as to the underlying real estate alone. The Debtor's justification for the terms of its reamortization is defensible: the 30–year term puts the amount of its monthly payment at a level well within its means; it needs an extended time to deal with the presence of the asbestos, both via remediation and via a legal determination of the liability for the presence; and it will give the Debtor an opportunity to try to obtain refinancing after it has made progress on "freshening" the building and addressing the asbestos problem.

The term of the proposed reamortization, then, does not unfairly saddle Prudential with a significant additional risk in recovering the value of its investment in the property. There is, then, no basis under § 1129(b)(2)(A)(i)(II) for denying confirmation as to this aspect of "present value."

### 3. Non-pecuniary Terms of Collateral Security as an Aspect of Present Value.

Prudential's final objection to the Debtor's cramdown proposal goes to certain nonpecuniary aspects of it. Though nominally sounding under § 1129(b)(2)(A)(i)(II), it implicates the "indubitable equivalent" analysis of § 11129(b)(2)(A)(iii).[47]

---

44. In fact, Prudential was the objecting creditor in *Monnier Bros.*

45. To be sure, the debtors in *Monnier Bros.* filed for Chapter 11 less than two years into the original term of the loan. Very arguably, the two-year extension under their proposed reamortizaticn was not an egregious alternation of the creditor's original expectations; it probably could have passed muster under some sort of "de minimis" label. However, the Eighth Circuit did not frame its holding in that fashion.

46. Of course, in Johannes's opinion such a term would be matched by significant concessions in other loan terms. His position on those points, however, has been addressed in the discussion immediately preceding.

47. The three avenues for cramdown under §§ 1129(b)(2)(A) are phrased in the disjunctive. In *Monnier Bros.*, however, the Eighth Circuit held that the theory of "indubitable equivalence" first articulated by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935), while nominally immured in § 1129(b)(2)(A)(iii), was equally applicable to the present-value analysis under § 1129(b)(2)(A)(i). 755 F.2d at 1339. Thus, a debtor proposing cramdown under § 1129(b)(2)(A)(i) must not merely provide for a retention of liens and compensation for the present value of the secured

By the unrebutted testimony of both Mott and Johannes, Prudential established that industry standards for ancillary covenants and commitments in security instruments for the financing of multi-family housing projects have changed significantly since late 1977. In virtually all respects, the changes have favored lenders.[48] As Prudential Exhibits 8 through 10 evidence, the changes have increased the length and complexity of promissory notes, mortgage instruments, and written assignments of rent, from the forms that the Debtor and Prudential used in 1977. As Prudential's witnesses testified, the changes have resulted in significantly greater duties on the part of borrowers to report and account to their lenders for the financial status of their projects. In cases involving assignments of rents as security, lenders now demand and obtain the right to interpose in the legal relationships between borrowers and their tenants, by setting minimum substantive standards for new leases. Lenders also now require comprehensive regular reporting on the status of rental revenues. Due to the increased presence of pension funds in the real estate investment community, promissory notes now always contain "yield maintenance" devices—most prominently, provisions for prepayment premiums or penalties. In the case of loans that previously would have been made on a "nonrecourse" basis, notes and security instruments now contain provisions imposing financial recourse on the borrower (and, in the case of a partnership borrower, its principals) if, after foreclosure and repossession, the lender discovers an environmental hazard on the property, the commission of waste by the borrower, or the borrower's failure to segregate tenant security deposits.

Under the Debtor's plan, the terms of the 1977 mortgage and assignment of rents would continue to secure the reamortized obligation to Prudential. Prudential insists that this proposal does not meet the "fair and equitable" requirement of §§ 1129(b)(1) and 1129(b)(2)(A)(i), because it deprives Prudential of the full range of nonpecuniary security protections it could now demand, were this a newly-originated loan.

For the reasons discussed earlier, Prudential's insistence on a market-governed standard is not well-founded for the present value analysis. Nonetheless, Prudential is entitled to insist on the execution of new security instruments, with content equivalent to what the parties would reasonably negotiate on a loan origination at the present time. Though there does not seem to be a single reported decision addressing the issue that Prudential raises, its right to this treatment stems from the basic nature of the Debtor's remedy under Chapter 11: to obtain legal enforceability for a new complex of binding contractual relationships with all of its creditors, which supplant those which obtained before its bankruptcy filing. *See In re Ernst,* 45 B.R. 700, 702 (Bankr.D.Minn.1985). The creditor whose debt is restructured under a confirmed plan of reorganization makes a "new loan" to the reorganized debtor, in the sense that its pre-petition rights to payment are expunged in favor of the new complex of pecuniary rights under the plan. *In re Fisher,* 930 F.2d at 1364 (quoting *United States v. Arnold,* 878 F.2d 925, 928 (6th Cir.1989)). In exchange for the forced entry into that loan, the creditor is entitled to demand both pecuniary and nonpecuniary terms that are sufficient to shelter it from the risks inherent in the Debtor's proposal.

As applied to this case, this proposition rebounds to Prudential's benefit. Since 1977, changes in the economy, business practices, and law have created or materially increased risks that were not previously anticipated by the parties, were not covered under the parties' pre-petition contract, or perhaps were not even in existence then. As Prudential's witnesses testified, terms to cover lenders for

---

creditor's investment, it must also *"insure the safety of the principal"* by other appropriate means that must be dictated by the circumstances of each case. *Id.* (quoting *In re American Mariner Ind.,* 734 F.2d 426, 433 (9th Cir.1984) (emphasis added by Eighth Circuit)).

48. Undoubtedly, these changes have been prompted by the events of recent years in the lending industry, as noted earlier. Another motivating factor, probably, was the actual or perceived increase in the risk of lender liability for environmental hazards on or in mortgaged real estate developments.

these risks are now imposed on all borrowers, regardless of their individual creditworthiness. In such circumstances, Prudential is well-put to insist on a novation of its secured rights, to correspond to those which it could reasonably demand were it willing to extend credit in an arms-length transaction, on the pecuniary terms proposed by the debtor. This makes the "new contract" of the plan a new one in all respects—and it preserves the Bankruptcy Code's general statutory balance between creditors' rights and debtors' remedies.

Of the "updates" in collateral rights demanded by Prudential, all but one are reasonable, and would be reasonably imposed in a new loan now. As the Debtor appropriately points out, it and its principals would not stand for an imposition of post-foreclosure financial recourse on them on the basis of the presence of asbestos in the property, and no reasonable borrower would do so. Prudential did not rebut the gist of Antonio Bernardi's testimony: that the asbestos was present in drywall, ceiling texturing, and pipe wrapping in the building when the Debtor purchased the property from Kellogg Square Company, and the Debtor neither knew of, nor had anything to do with, its presence at that time. Prudential would not be within its rights in insisting on conditional recourse on this basis in a nonbankruptcy setting, and it is not entitled to do so in the context of this case.

However, because Prudential is entitled to demand market-standard terms as to all of the other points for which the Debtor's proposed security deviates from current norms, the Debtor's proposal does not afford Prudential the "indubitable equivalent" of its current secured rights. As to this final aspect, then, the plan cannot be confirmed over Prudential's rejection.

## VII. CONCLUSION

On all but three of the issues raised by Prudential in objection to confirmation, the Debtor prevails on the record as made. As to two of those issues, Prudential has made sustainable objections, and the Debtor's plan cannot be confirmed.

**IT IS THEREFORE ORDERED** that, on the bases set forth in this order, confirmation of the Debtor's plan of reorganization, as filed on March 5, 1993, is denied.